[No. E004572. Fourth Dist., Div. Two. June 8, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD J. DERELLO et al., Defendants and Appellants.

**COUNSEL**

David D. Carico and Maureen J. Shanahan, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Dianna M. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.\***—After an unsuccessful motion to suppress evidence (Pen. Code, § 1538.5) defendants Donald J. Derello and David Wayne Taylor proceeded to jury trial on the joined charges of transporting cocaine, in violation of Health and Safety Code section 11352. There were further allegations that each of these defendants was ineligible for probation (Pen. Code, § 1203.073, subd. (b)(6), (7).) The jury found each defendant guilty of the charged offense. Probation applications were denied and each defendant was sentenced to prison for the aggravated term of five years. Each was ordered to pay a restitution fine of $5,000. Derello and Taylor appeal.

### FACTS

Detectives Kaiser and Greenwell of the Los Angeles Police Department were assigned to the Ontario International Airport as part of the Narcotics Task Force to investigate narcotic trafficking. Each had extensive narcotic investigative experience. Kaiser had 15 years and Greenwell had 8 years. These detectives observed Taylor and Derello standing in front of the Avis rental car counter in conversation with the clerk. They were casually dressed. Derello wore gold colored "very expensive type . . . jewelry." Both appeared "nervous." Taylor was looking about as if scanning the area, possibly looking for people who were looking at him. He walked away from Derello, then returned.

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

Detective Kaiser concluded, from their casual dress, they did not appear to be businessmen. Derello was carrying a maroon colored vinyl type suitcase. Taylor was carrying a brown, hardsided battered suitcase. The detectives heard Derello telling the Avis clerk he had just arrived from Phoenix on Southwest Airlines. He asked to rent a Cadillac or Lincoln Continental. The Avis clerk had no such car. He directed Derello to the Hertz counter. Derello talked briefly with Taylor and then went to the Hertz counter. There Derello filled out rental papers using the name Donald Derello. Both men then proceeded to the area where the rental car was parked.

Detective Kaiser talked with the Hertz clerk, requested to be notified when the two persons returned the rental car. Detective Greenwell checked Southwest Airline's passenger list. He could not find Derello's name as a passenger from Phoenix.

The next day (March 12, 1987) around 3:15 p.m. Avis notified the detectives Derello was returning the car. They watched him. Derello paid cash for the rental car. Derello was carrying the hard brown suitcase. Taylor was carrying with him the maroon soft suitcase. Taylor had a new beige carry-on piece of luggage. Taylor stood with Derello for a moment, then walked toward the terminal for America West Airline, where he got in the ticketing line. Detective Kaiser followed.

Derello in the meantime left the Hertz counter and walked to the telephones in the main lobby of the airport. He put the brown suitcase down on the floor and walked to the telephones a few feet away and there placed a call. After the call he went to the America West Airline counter and talked with Taylor who still waited in line. Derello obtained two baggage identification tags from the American West counter. He filled out the tags with the name "D. Williams." He walked back to Taylor, put one tag on the maroon bag and one tag on the beige bag.

Taylor finally reached the counter. There he bought two one-way tickets to Phoenix, giving the passenger names of *Doug Williams* and *Tony Williams*. He paid cash for the tickets and surrendered the tagged luggage to the America West agent. The bags were then placed on a conveyor belt behind the ticket counter and moved to the rear of the ticketing area. Detective Kaiser followed the luggage.

After buying the tickets Derello and Taylor spoke briefly then separated. Taylor walked through the screening area to the boarding area and Derello returned to the telephone area where he retrieved the brown suitcase he had been carrying. He carried the suitcase through the X-ray screening door without incident.

At this point Detectives Hadley and Greenwell approached, greeted Taylor, showed their badges to him. They stated they were police officers. They told Taylor he was not under arrest and was free to leave, they were conducting an investigation. They asked Taylor if he would mind talking to them? Taylor replied, "I don't mind. What kind of investigation are you conducting?" Hadley responded, "Narcotics." Taylor responded, "Sure what is it you want to know?" Taylor was asked for identification. He said he had none. He however handed his airline tickets to Detective Hadley, stating he was flying to Phoenix with his brother. He said his name was Doug Williams and his brother's name was Tony Williams. He gave an address in Phoenix as 2202 West Wayland. Hadley read the names on the tickets and looked at the two baggage tags attached to the folder. He asked Taylor if he had any baggage. Taylor said he had checked the baggage and showed the two tags on the folder. The detectives then asked Taylor for permission to search his baggage. Taylor responded, "*I don't mind. Go ahead.*" (Italics added.) Officer Britt was told Taylor had given permission to search. He alerted Detective Kaiser, who was still following the suitcases. With knowledge of the consent given, Kaiser searched the bags. Inside the maroon case he found two plastic baggies each containing a white substance—cocaine. The baggies were wrapped inside a pair of men's jogging pants.

In the meantime Detectives Greenwell and Hadley continued to talk with Taylor. Taylor said he was looking for his brother. The detectives indicated they would also like to talk to the brother. They asked if he would mind walking back to the waiting area of the terminal. Taylor said, "Sure." When they walked inside the terminal, the detectives saw Derello standing alone by the pay phones. The detectives pointed to Derello and asked if that was his brother. Taylor stated, "No." They asked Taylor if he knew the person they were pointing to. Again Taylor said, "No."

Detective Hadley next approached Derello and identified himself as a police officer. He said he was conducting an investigation. He told Derello he was not under arrest and asked to speak to him. Derello replied, "Sure." Detective Hadley pointed to Taylor and asked if Derello knew him. Derello said, "No." Hadley asked permission to search the brown suitcase carried by Derello and Derello consented. No contraband was found in the suitcase.

At this point Detective Kaiser approached and told his fellow officers he had found the cocaine in the checked baggage. Taylor and Derello were then arrested.

At trial Derello testified in his own defense. He admitted he was the owner of the suitcase containing the cocaine, but swore the cocaine was not

his; he did not know it was in the suitcase. Derello testified he was going to visit his girlfriend, Kim, in San Bernardino. He and Taylor switched suitcases because Taylor needed a larger suitcase and Derello no longer needed the large maroon suitcase. Derello asked Taylor if he wanted identification tags placed on the suitcase. Taylor told him to put the name "Williams" on the tags. Taylor explained the reason to Derello: the reservations were under the name of Williams. Derello said while he was back at the telephones placing another call the officer approached him and told him to get off the phone. The officer showed his badge and said something about a narcotics investigation. Derello testified in response to the officers' question, did he know Taylor, he had said, "Yes."

CONTENTIONS

Taylor contends the trial court should have granted his Penal Code 1538.5 motion to suppress because (1) there was no cause for the detention and (2) the consent to search was ambiguous and limited in scope.

Derello makes this further contention: the trial court erred in allowing testimony of the detectives to the effect he, Derello, met the criteria of a "drug trafficker" profile.

Both defendants assert the imposition of a $5,000 restitution fine was excessive under the circumstances of this case.

DISCUSSION

I

*Derello Appeal*

Derello contends that the trial court erred in admitting the detective witnesses' testimony regarding the "drug trafficker profile" over his objections pursuant to Evidence Code sections 210, 350, 352 and 1101. In his motion *in limine*, counsel argued that there was no reason to admit this evidence because it was irrelevant to the issues before the jury, which were the elements of the crime of transportation of cocaine—the unlawful transportation of the cocaine with knowledge of its nature as a controlled substance. The prosecution argued that it was necessary in order to explain to the jury why the police became suspicious of the duo and that this information was relevant to the case.

After the court opined that the facts surrounding the detention had some relevance to the case, Derello's counsel argued that whatever relevance

there might be was outweighed by the prejudicial effect of the profile on the jury and that the evidence of the profile was also character evidence barred by the Evidence Code. Counsel then offered to stipulate that he would not argue to the jury that the surveillance was in any way improper, and offered to affirmatively state to the jury that the stop by the officers was perfectly justified. The court rejected this offer, concluding that the evidence was "of some value in explaining the conduct of the police" and that it was not unduly prejudicial. The court denied the defense motion but indicated that it would admonish the jury that the evidence was being admitted only to explain the conduct of the officers.

At trial the prosecution elicited from the detective witnesses' testimony that Derello was wearing lots of gold-looking jewelry when he was arrested, that he was carrying a large amount of cash, that the defendants were youthful and dressed casually rather than as businessmen, and that they had rented an expensive car. Over strenuous objections, the detectives were permitted to testify that these characteristics matched a list of characteristic of drug couriers using the airlines to transport drugs. Again over objection, a bag of gold colored jewelry taken from Derello was entered into evidence and displayed to the jury. The detectives also testified, without objection, that Taylor was very nervous and kept scanning the airport as if looking for people who might be looking for them, and that the two used false names when purchasing their tickets and tagging their bags. They also described at some length defendants' peculiar method of moving through the airport. In their testimony, the detectives did not link these latter characteristics to the drug trafficker profile.

At the time of the introduction of the testimony concerning the drug trafficker profile, the trial court gave the following admonition to the jury: "[Y]ou are advised that the testimony is only offered for the purpose of providing you with some background to explain the subsequent conduct of the officer in this case and is limited to that purpose only simply to explain the conduct of the officer/witness." The jury was also given the following instruction at the end of the case: "Evidence of a 'narcotics trafficker profile' has been introduced for the limited purpose of explaining initial police conduct in this case. It is not in itself indicative of guilt or innocence in any way. You are to consider it only in the context of understanding what characteristics the police look for when investigating narcotics trafficking. It is only a screening tool; innocent as well as guilty persons may fit the profile."

These rulings must be examined in light of the issues before the trial court of (1) whether the defendants were transporting cocaine and (2) whether the defendant Derello knew the substance transported was cocaine.

## II

To evaluate the contention made by Derello we must examine the "drug trafficker profile." What is it and what is it not? Police officials contend the drug courier profile is the factual equivalent of the "casing" evidence in *Terry* v. *Ohio* (1968) 392 U.S. 1, 6, 27-28 [20 L.Ed.2d 889, 897, 909-910, 88 S.Ct. 1868], which warranted a stop and frisk.

Certain of the elements making up the profile include aspects of a suspect's behavior which may be clearly indicative of an ongoing crime. When a subject uses an alias on travel documents or when the suspect takes an evasive or erratic path to an airport in a manner which demonstrates a desire to avoid detection, such acts may be evidence of a crime in progress. Such facts are admissible not only as a basis for "detention" when such is an issue in a case but also may come in as proof of a crime in progress. Such evidence may be relevant to such issues as knowledge of the contraband nature of the substance or of intent to commit the crime of transporting an illegal substance.

On the other hand there are other elements of the drug courier profile which identify personal characteristics of the suspect which may be shared in common by drug couriers and the public at large. The prosecution argues such characteristics, when presented in sufficient numbers, serve to identify a drug courier. These "probabilistic" elements include nervousness, destination of or arrival from a drug source city, arrival at a drug reception city, time of flight, position among the disembarking passengers, manner of dress, presence of large amount of apparently gold jewelry, youth. Almost all of these latter elements of the profile describe a cross-section of the people who use planes but without any indication of who of those in that cross-section are predominantly or even mainly engaged in any ongoing crimes. By themselves these elements indicate no ongoing criminal activity but merely attempt to identify an individual as a type of person who may engage in a criminal enterprise based upon stereotype of drug courier appearance or behavior.

## III

In *U.S.* v. *Sokolow* (9th Cir. 1987) 831 F.2d 1413, at page 1418, the court observed, "[T]he phrase 'drug courier profile' [is not] a talismanic label that the government can apply to any given set of facts to obviate consideration of whether reasonable suspicion existed. Indeed it is obvious that the 'drug courier profile' often has a chameleon-like way of adapting to any particular set of observations. [Citations.])"

In *United States* v. *Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870], the United States Supreme Court first encountered the "drug courier profile." The court concluded the stop in *Mendenhall* was consensual and thus did not amount to a seizure within the meaning of the Fourth Amendment. (*Id.,* at p. 555 [64 L.Ed.2d at p. 510].) In *Mendenhall* Justice Stewart noted that the initial confrontation was based upon the "so called 'drug courier profile'—an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." (*Id.,* at p. 547, fn. 1 [64 L.Ed.2d at p. 505].) Three of the justices concluded in a concurring opinion that the agents reasonably suspected that the defendant was "engaging in criminal activity" without commenting on the drug courier profile. (*Id.,* at p. 560 [64 L.Ed.2d at p. 513].) Only Justice White's dissenting opinion analyzed the "drug courier profile." (*Id.,* at pp. 568, 571-573 [64 L.Ed.2d 518, 520-521].) He concluded, with three justices in concurrence, that the nervousness and other behavior exhibited by Mendenhall was "behavior that could reasonably be expected of anyone changing planes in an airport terminal," (*id.,* at p. 572 [64 L.Ed.2d at p. 521]) and that the officer who detained her was acting on "an unparticularized suspicion or 'hunch.'" (*Id.,* at p. 573 [64 L.Ed.2d at p. 521].)

In the case of *Reid* v. *Georgia* (1980) 448 U.S. 438 [65 L.Ed.2d 890, 100 S.Ct. 2752] the United States Supreme Court vacated a decision in the Georgia Court of Appeals which had found reasonable suspicion for seizure based upon a number of characteristics within the courier profile. (*Id.,* at pp. 439-440 [65 L.Ed.2d at pp. 892-894].) The Supreme Court noted "[o]f the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances [drug source city departure, early morning arrival, no luggage other than shoulder bags] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." (*Id.,* at p. 441 [65 L.Ed.2d at p. 894].) The court rejected the contention that the drug profile factors relied upon in stopping Reid gave rise to a reasonable suspicion of ongoing criminal activity. (*Ibid.*)

In *Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319], Justice White, speaking for a plurality of the court, discussed the "so-called 'drug courier profile.'" (*Id.,* at p. 493 [75 L.Ed.2d at p. 233].) Defendant contested a search occurring after a stop occasioned by the profile. (*Ibid.*) The plurality held the initial stop was justified by a reasonable suspicion but that subsequent movement of Royer to a small room exceeded a permissible level of an investigative stop. (*Id.,* at pp. 502-503 [75 L.Ed.2d at pp. 239-240].) Both dissenting opinions agreed the initial stop was justified by a

reasonable suspicion of ongoing criminal activity; Justice Rehnquist specifically discussed the courier profile. (*Id.,* at p. 525, fn. 6 [75 L.Ed.2d at p. 254].) Justice White noted, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." (*Id.,* at p. 497 [75 L.Ed.2d at p. 236].)

Royer was traveling under an alias. (460 U.S. at p. 494 [75 L.Ed.2d at p. 234].) The name the officers observed on his luggage and ticket was not the name (Royer) on his driver's license. (*Id.,* at pp. 493-494 [75 L.Ed.2d at pp. 233-234].) Said the court: "[w]hen the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers—paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general—were adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or to dispel their suspicions in a manner that did not exceed the limits of an investigative detention." (*Id.,* at p. 502 [75 L.Ed.2d at p. 239].)

The California Supreme Court in *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, at pages 785 to 787 [195 Cal.Rptr. 671, 670 P.2d 325], reviewed a detention and arrest at an airport of a person who matched the "drug courier profile." Police officers had observed (Flip) Wilson with a companion (Rashon) at an airport arriving on a flight from Miami, Florida. (*Id.,* at p. 780.) As a detective Kaiser watched, both Wilson and Rashon looked around the waiting area. (*Ibid.*) Kaiser stated that at the time "he observed nothing unusual about Wilson, but that Rashon made 'eye contact' with him on two occasions, an occurrence which was consistent with the behavior of persons he had arrested in the past for transporting narcotics." (*Ibid.*)

Kaiser admitted Rashon could have simply been looking for someone who was meeting the plane, but testified that it did not appear that way to him. (34 Cal.3d at p. 781.) He conceded, however, that "he could not articulate any objective basis for differentiating the 'eye contact' of drug couriers from that of other persons." (*Ibid.*)

The Supreme Court held the contraband obtained by the officer's search of Wilson's attache case was obtained in violation of the Fourth Amendment of the United States Constitution; it should have been suppressed by

the trial court, even though the suspect gave his consent to the search, where he was illegally detained. (34 Cal.3d at pp. 790-791.) As a matter of law, said the court, the officer did not have an objective, articulable basis to justify his detention. (*Id.,* at pp. 786-787.) The officer had observed Wilson at an airport with a companion arriving from Miami, Florida, and had followed him to his car. (*Id.,* at pp. 780-781.) Apart from the fact his companion made brief eye contact with the officer, the officer did not identify any circumstances which would have provided a reasonable basis for distinguishing Wilson from the great bulk of passengers arriving at the airport. (*Id.,* at p. 786.) The officer "did not detain Wilson, for federal constitutional purposes, merely by approaching him, identifying himself as a police officer, and asking if he might have a minute of his time." (*Id.,* at 790.) Wilson was detained when the officer advised him that he was conducting a narcotics investigation and had received information Wilson would be arriving from Florida with a lot of drugs. (*Ibid.*) Under the circumstances, no reasonable person in the suspect's position would have believed he was free to leave without complying with the officer's request. (*Ibid.*) The Supreme Court held the trial court erred in failing to suppress the evidence obtained as a result of that illegal detention. (*Id.,* at p. 791; see also *In re James D.* (1987) 43 Cal.3d 903, 912 [239 Cal.Rptr. 663, 741 P.2d 161].)

On April 3, 1989, the United States Supreme Court overruled *U.S.* v. *Sokolow, supra,* 831 F.2d 1413, to the extent that it held that characteristics of the drug trafficker profile which were merely "probabilistic" and not indicative of a crime in progress would not justify a detention. (*United States* v. *Sokolow* (1989) 490 U.S. 1, __ [104 L.Ed.2d 1, 11, 109 S.Ct. 1581, 1586].) It held that in making a determination of whether police had "reasonable suspicion" sufficient to detain a suspect for further investigation, the germane inquiry is not whether particular conduct is "guilty" or "innocent," but what degree of suspicion attaches to particular types of noncriminal acts. (*Id.,* at p. __ [104 L.Ed.2d at p. 12, 109 S.Ct. at p. 1587].)

## IV

█ While all the characteristics of the drug trafficker profile may now be used by investigating officers to form a reasonable suspicion warranting a *detention* for further investigation, this does not mean they may be used indiscriminately as evidence in the *trial* of a case. Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." Evidence Code section 210 provides in turn that relevant evidence is evidence "having any tendency in reason to prove or disprove any *disputed* fact that is of consequence to the determination of the action." (Italics added.) █ Evidence of a nondisputed issue or of an issue not before the jury

is inadmissible. (See *People* v. *Coleman* (1979) 89 Cal.App.3d 312, 321 [152 Cal.Rptr. 407].) "There is *no* discretion vested in a court to admit irrelevant evidence." (*People* v. *Kitt* (1978) 83 Cal.App.3d 834, 849 [148 Cal.Rptr. 447], italics in original.) ■ It is also error "to give an instruction that pertains to an issue not before the jury" because such an instruction may be not only erroneous but prejudicial. (*Coleman, supra,* at p. 321.)

■ Based on the above rules of law, it is clear that characteristics of the drug courier profile which are evidence of ongoing criminal activity may be introduced at trial to prove the elements of the crime charged. In the case at bench evidence of such activity could be found in the use of aliases, tagging of the luggage with the aliases, as well as the peculiar manner of these defendants' moving through the concourse. These characteristics were admissible because of their tendency to prove the material facts of knowledge and intent. Significantly, defense counsel did not object to introduction of these facts.

However, it is equally clear that evidence of the amount of gold jewelry worn by Derello, of the amount of cash defendants carried, of the youth and casual dress of defendants, and of their rental of an expensive car had no tendency in reason to prove any issue in the trial, and was inadmissible on any ground. Moreover, there is no justification for admitting testimony concerning the existence and nature of the drug trafficker profile itself. Such evidence has absolutely no relevancy to the elements of the crime and might be perceived by the jury to be evidence of the character of defendants as drug couriers. Thus, it is inadmissible under both Evidence Code section 350 and Evidence Code section 1101. Finally, it was error for the trial court to give an instruction on the drug trafficker profile evidence. (*People* v. *Coleman, supra,* 89 Cal.App.3d at p. 321.) Such evidence might have confused and prejudiced the jury, and might have been disruptive of its truth-finding process.

V

While we conclude it was error to admit those characteristics of the drug courier profile which were not evidence of an ongoing crime, we are not prepared to say their admission is of sufficient moment or weight as to require reversal. The totality of evidence in this case points without shadow of doubt to the guilt of these defendants. It is not reasonably probable a different result would have been forthcoming had the improper evidence not been placed before the jury. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ We also conclude there was no detention involved in the original approach of the officers here. This was at most a "consensual" encounter

where the officers were doing exactly what they were lawfully entitled to do, which is to approach and talk if the subject is willing. (*In re James D., supra*, 43 Cal.3d 903.) The consent here given was not a product of any illegal detention. (Compare *Wilson* v. *Superior Court, supra,* 34 Cal.3d at p. 791.)

## VI

 Derello complains of abuse of discretion in the court's imposing a $5,000 restitution fine. Under Government Code section 13967, subdivision (a), the determination of the amount of the fine within the statutory limits is within the sound discretionary power of the court. (*People* v. *Griffin* (1987) 193 Cal.App.3d 739, 741 [238 Cal.Rptr. 371].) The decision is not to be disturbed without showing a clear abuse of discretion. (*Ibid.*) A statement of reasons is not required for the imposition of the fine. (*Ibid.*) "[T]he fine must be supported by the record, including those circumstances set forth in the probation officer's report." (*Ibid.*) Here there appears to be no abuse of discretion on the part of the court. Several factors point to imposition of a substantial fine. Derello had suffered a prior prison commitment. Ten days prior to committing the offense he had been granted felony probation for possession of cocaine; the instant offense involved almost two pounds of cocaine which the court noted had a street value of in excess of $80,000. The maximum sentence plus a $5,000 fine was warranted.

*David Wayne Taylor Appeal*

## I

Taylor contends he was illegally detained when consent was obtained; the police had no objective facts, he argues, no articulable basis to conclude he was committing a criminal offense. On appeal Taylor contends the police officer's testimony on the "drug courier profile" was error requiring reversal. (*Reid* v. *Georgia, supra,* 448 U.S. 438; *Florida* v. *Royer, supra,* 460 U.S. 491; *Wilson* v. *Superior Court, supra,* 34 Cal.3d 777.) In each of these cases the "drug courier profile" used by a narcotics agent in determining which persons were suspected of criminal activities was held insufficient to warrant detention of the suspects.

 Taylor's claim of error in admitting the contraband is met at the outset by a procedural hurdle. In his motion to suppress hearing Taylor *challenged the scope and extent of the consent given to search.* Before this court and for the first time Taylor presents a new legal theory. He argues he was illegally detained before he gave his consent to search.

A prerequisite to raising an issue for appellate review is an objection in the trial court thus preserving the issue for the appeal court. *People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240] held the defendant was precluded from raising the issue on appeal if he failed to preserve the issue by appropriate objection in the trial court. The rule also requires the objection be made on the same grounds urged on appeal. (*People* v. *Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178].) The Supreme Court said in *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640 [108 Cal.Rptr. 585, 511 P.2d 33], "[t]o allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is initially raised."

The People should have had the opportunity to answer the argument at the trial court level. To hold otherwise would allow a defendant to gamble on an acquittal at his trial with the ace in the hole of a reversal of that conviction on appeal. (*Coy* v. *Superior Court* (1959) 51 Cal.2d 471, 473 [334 P.2d 569].) At no time during the section 1538.5 motion hearing did Taylor raise the issue of the police's right to contact and to talk to him. His contention was that the scope and extent of the consent to search were ambiguous.

After the unsuccessful section 1538.5 hearing but before trial Taylor sought and obtained a hearing pursuant to Evidence Code sections 402 and 403 to determine the admissibility of certain of his statements made *without benefit of Miranda admonitions* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). His trial counsel pinpointed the exact statements sought to be suppressed. They were made by Taylor, who when confronted with Derello denied he knew Derello. A further statement sought to be suppressed was Taylor's stating to officers his name was Tony Williams. Taylor testified he recanted, told the police he was David Taylor. Once again the issue raised in the pretrial hearing was not whether consent in fact was given but rather whether he was in custody at the time the statements were made.

Thus the hearings obtained by Taylor had two separate and distinct issues: (1) the section 1538.5 hearing where the issue was scope of consent, and (2) the hearing challenging the admissibility of certain statements in the pretrial section 402-403 evidentiary hearing, in which, as we explain below,

Taylor *indirectly* sought a review of the same issue determined adversely in the prior section 1538.5 motion to suppress.[1]

In the section 402-403 hearing the focus was on the question of whether Taylor was in custody, thus invoking *Miranda* requirements. While the question was not raised as to whether there was lacking reasonable suspicion upon which to base an alleged detention, thus invalidating consent to search, yet what Taylor sought to raise was the issue of illegal detention by claiming *Miranda* error. Neither hearing is shown on the record before this court to contain error. There is no cause for a reversal on the issue of illegal detention as raised in the section 402-403 pretrial hearing. Nor as we determined above, would there be cause for reversal on the "drug courier profile" issue, had it been properly preserved by Taylor for appeal. (*People* v. *Smith* (1983) 34 Cal.3d 251, 270-271 [193 Cal.Rptr. 692, 667 P.2d 149].)

## II

Taylor next contends his consent to search was invalid because it was ambiguous and equivocal. This issue was raised and adjudicated below. Taylor claims he consented only to a search of the suitcase Derello was carrying; he did not consent to a search of the luggage which had been checked with the airline. We examine this contention on its merits.

Without question there was substantial evidence to support the trial court's finding of a valid unambiguous consent. A review of the evidence of the events surrounding the obtaining of consent from Taylor discloses no coercive actions by the police. Nor is there any fact in the record which would give rise to an ambiguity as to the nature of the consent sought and the consent given. The detectives asked Taylor if he had airline tickets. In response Taylor showed the detectives his two airline tickets. Hadley asked if he had baggage. Taylor responded "yes," all he had was "checked baggage." The detectives then asked if they could search that baggage. When Hadley asked Taylor for permission to search, he had in hand the two baggage tickets attached to the folder. Taylor had no baggage in his personal possession.

These arguments rest on disputed questions of fact which were resolved against Taylor in the section 1538.5 hearing. The court found there was in fact consent to search the luggage actually searched. ■ In the section 1538.5 hearing the superior court was sitting as a finder of fact. The judge determined credibility of witnesses, resolved conflicts in testimony. He had the duty to weigh the evidence and draw rational inferences therefrom.

---

[1] Once the pretrial suppression hearing has been held "in the superior court" any review thereafter desired by the defendant prior to trial shall be by means of an extraordinary writ of mandate or prohibition. (Pen. Code, § 1538.5, subd. (i).)

(*People* v. *Superior Court* (*Keithly*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) On appeal all presumptions favor a proper exercise of that power. (*Ibid.*) The trial court's finding must be upheld if supported by substantial evidence. (*Ibid.*)

Taylor testified he told the detectives he had not checked in any luggage. The trial court heard this contradictory evidence. At conclusion of evidence the court denied the motion, stating "I have listened to the testimony of the all the witnesses, and it is my belief and beyond a reasonable doubt that the officers said to the Defendant the words that were spoken and testified to, and defendant's response was as indicated by the officers. [¶] If there was any misapprehension, it was on the part of the Defendant Mr. Taylor.

"I think there was not any ambiguity in this case and [Taylor] freely and voluntarily gave consent . . . [H]e of course had dominion and control over the items in question." We are bound by the trial court's evidentiary findings. They are supported by substantial evidence.

### III

Taylor finally contends the imposition of the restitution fine of $5,000 is excessive. This contention is without merit. Government Code section 13967, subdivision (a) authorizes a restitution fine of from $100 to $10,000 for any person convicted of a felony. A determination of the actual amount within the statutory range is within the discretion of the court. (*People* v. *Walsh*█ (Cal.App.).) There is no basis existing in law or fact in this record for the reversal of the fine, sentence or conviction of Taylor.

### DISPOSITION

The judgments are affirmed.

Campbell, P. J., and Hollenhorst, J., concurred.