[No. B062967. Second Dist., Div. Four. Sept. 16, 1992.*]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE C. BURNETT, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

*Review granted November 19, 1992. Opinion ordered published by Supreme Court December 21, 1992. Review dismissed February 11, 1993, pursuant to rule 29.4(c), California Rules of Court, with directions that the opinion remain published.

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, J.**—Willie C. Burnett appeals from his conviction after jury trial of kidnapping in violation of Penal Code section 207, subdivision (a), and forcible rape in violation of Penal Code section 261, subdivision (2). He contends that the trial court committed reversible error in refusing to instruct in terms of CALJIC No. 10.65; that the restitution order which formed part of his sentence did not comply with the law, and that the abstract of judgment does not accurately reflect the sentence imposed by the court. In the published portion of this opinion we conclude that the trial court was correct in refusing to give the CALJIC No. 10.65 instruction. In the unpublished portion of this opinion, we explain why this case must be remanded to the trial court for redetermination of the restitution fine and for correction of the abstract of judgment.

### FACTUAL AND PROCEDURAL SUMMARY

Maria D. testified that at about 10:30 on the evening of January 2, 1989, she called her boyfriend, Rigoberto Gandara, from a pay phone on the corner of Broadway and 42d Street in Los Angeles. She previously had a telephone conversation with him from her home, but that conversation ended when her mother told her not to talk on the telephone any longer.

After talking to Mr. Gandara on the pay phone for two or three minutes, Maria D. saw appellant standing in front of a liquor store across the street. He crossed the street and asked her how long she was going to be using the telephone. She told him she would be about two minutes.

Over the telephone, Mr. Gandara asked Maria D. who was there. Maria D. told him that it was "a guy that wants to use the phone." Appellant then reached over and disconnected the call by clicking down the mechanism. He told Maria D. that he had a gun, and he instructed her to walk with him. He said that if she did not do so he would shoot her. His hand was in his jacket pocket.

Appellant and Maria D. walked several blocks, then entered a garage or shack behind a house. Throughout the walk, appellant kept his arm around Maria D.'s neck and his hand in his jacket pocket. He told Maria D. that he was a Four-Trey Crip and that the Four-Trey Crips liked to go after people. Maria D. repeatedly asked appellant not to hurt her. She thought appellant had a gun, and she was too scared to run or scream or to call out for help.

At the shack, appellant's brother answered the door, spoke to appellant briefly, then left through a side door. Maria D. told appellant that she wanted

to go home. Appellant told Maria D. that he wanted to " 'try me.' " He took off his jacket, and Maria D. realized that he did not have a gun.

Appellant told Maria D. that crying would do her no good. He then indicated that either he or his friends would "do it," and then he raped her. Afterward, appellant told Maria D. that he would walk her home. Although Maria D. said that she could go alone, he accompanied her. As they walked toward Broadway appellant told Maria D. that he knew she would not "set him up," and that he knew where she lived.

By then Mr. Gandara, who became concerned when his telephone conversation with Maria D. was abruptly terminated, had begun to look for her. He and his brother drove to the area of the pay telephone at Broadway and 42d Street, arriving there about 20 minutes after the telephone conversation had ended. Mr. Gandara saw Maria D. walking with appellant on Broadway. When Maria D. saw Mr. Gandara's car, she ran to it. Appellant ran away. Once inside the car, Maria D. started to cry.

Maria D. reported the crime to the police the next day. She did not report it sooner because she was afraid of appellant and embarrassed by what had happened. During the subsequent police investigation, Maria D. identified appellant's picture in a photographic lineup.

The prosecution called Los Angeles Police Department Detective Lewis. He testified that on January 4, 1989, he interviewed appellant twice at the Newton Division police station. In the first interview, appellant said that he had spent the last three days with his girlfriend. Detective Lewis then handcuffed appellant to a bench in the hallway. About 10 minutes later, he learned that appellant wanted to talk to him again. In the second interview, appellant told Lewis that he had lied about being with his girlfriend. He said that the girl at the telephone booth at 42d and Broadway had waved him over, asked him if he wanted to have sex, and told him that he would have to pay for it. She called the police because he did not pay her. When he reached the liquor store on Broadway, Maria D. called his name from across the street. She was not using the telephone. He knew Maria D.'s brother, and had known her as a child, although he had not spoken to her in a year or two. Maria D. crossed the street and initiated a conversation with appellant. She mentioned that she was upset with her boyfriend or her parents, and was out to have a little fun. After some conversation, she suggested to appellant that she go home with him. Although appellant was not comfortable with the idea, he agreed. At no time during the walk to his house did he have his arm around her neck or tell her that he was a Four-Trey Crip.

Once Maria D. and appellant reached appellant's house they watched movies on the VCR. After a while, Maria D. made sexual advances toward

appellant and told him that she had never " 'had a chance to have sex with a Black guy.' " Appellant described the next events as follows: "Then after that she say let's—go on and get in the bed, you know so we had got in the bed together. And I said we had sex. It didn't last no longer than what two, three minutes, I just got up. I said I ain't even gonna like this. I don't know if I upset her or what. But she asked me did I have 15 or twenty dollars." Appellant told Maria D. that he did not have the money, and she became upset. Appellant began to walk Maria D. home. When they reached Broadway, a car pulled up and she got in.

When appellant learned that the police wanted to talk to him about the incident he contacted them voluntarily. Detective Lewis of the Los Angeles Police Department interviewed appellant twice, and both times appellant related essentially the same facts that he testified to in court.

DISCUSSION

I

Appellant contends that the trial court's refusal to instruct the jury in terms of CALJIC No. 10.65,[1] on reasonable but mistaken belief of consent, was reversible error. This contention lacks merit because there was no evidence to justify the instruction.

The defense of mistaken belief in consent was recognized by the California Supreme Court in *People* v. *Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337]. In that case, the court reviewed case law under Penal Code section 26, which provides that a person who commits an act under a mistake of fact that negates criminal intent, cannot be convicted of a crime requiring such intent. The court held that "[i]f a defendant entertains a reasonable and bona fide belief that a prosecutrix voluntarily consented to . . . engage in sexual intercourse, it is apparent that he does not possess the wrongful intent that is a prerequisite . . . to a conviction of . . . rape . . . ." (*People* v. *Mayberry, supra,* 15 Cal.3d at p. 155.)

Appellant argued to the trial court, and argues here, that CALJIC No. 10.65 should have been given because Maria D.'s conduct was ambiguous, citing evidence that Maria D. did not seek help when appellant's brother answered the door to the shack, and that she made no effort to resist or escape after she learned that appellant was not carrying a gun.

---

[1]CALJIC No. 10.65 then provided, in part, "In the crime of forcible rape, general criminal intent must exist at the time of the commission of the rape. There is no general criminal intent if the defendant had a reasonable and good faith belief that the female voluntarily consented to engage in sexual intercourse. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge."

The trial court ruled that the instruction was not warranted because the factual issue in the case "is pretty clearly framed to a consent or lack of consent." The court noted "this isn't a matter of a jury inferring a reasonable good faith belief from what she testified, but that they would have to disregard her testimony and it seems to me if they do that, they are going to acquit him on the consent instruction." The trial court was correct.

■ When a *Mayberry* defense is raised, the jury will first consider the victim's state of mind and decide whether or not there was consent to the acts. If they determine that there was no consent, the jury will view the events from the defendant's perspective to determine whether the manner in which the victim expressed lack of consent was so equivocal as to cause the accused to assume that there was consent where in fact there was none. (*People* v. *Romero* (1985) 171 Cal.App.3d 1149, 1155-1156 [215 Cal.Rptr. 634].)

■ It is true that a trial court must instruct on any theory of the case that is supported by substantial evidence. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1].) But it is not required to instruct—indeed, it is error to instruct—on a theory that is entirely unsupported by the evidence. (*People* v. *Derello* (1989) 211 Cal.App.3d 414, 426 [259 Cal.Rptr. 265].) ■ In this case, no evidence supported a *Mayberry* defense. A jury viewing the evidence from appellant's perspective would have found no basis to conclude that Maria D.'s conduct misled appellant into an erroneous belief that she consented to have sex with him. His theory and evidentiary showing were quite different: that Maria D. instigated contact with him, suggested that she go home with him, initiated sex, and asked for money, and that he reluctantly acceded to her unequivocal demands. Appellant did not testify that he erroneously deduced consent from Maria D.'s lack of struggle or failure to attempt to escape, and the substance of his testimony negates that possibility.

As the trial court noted, if the jury had credited appellant's testimony it would have found that the prosecution had failed to prove lack of consent, and it would have acquitted on that basis.[2] No reasonable jury reviewing the evidence could have found a mistaken but good faith belief in consent based on ambiguous conduct in this case. If the defense evidence is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex, the instruction should not be given. (*People* v. *May* (1989) 213 Cal.App.3d 118, 125 [261 Cal.Rptr. 502].)

We recognize that the *Mayberry* decision has been construed by at least one court to require that an instruction on reasonable belief of consent must

---

[2]The jury was given CALJIC Nos. 10.00 and 1.23.1, defining "consent," and instructing that lack of consent is an element of rape.

be given whenever consent is offered as a defense to a charge of rape. The rationale is that "the defendant who relies on the defense of consent necessarily also relies on the defense that he had a reasonable and good faith belief that there was consent." (See *People* v. *Hampton* (1981) 118 Cal.App.3d 324, 329 [173 Cal.Rptr. 268].) This reasoning has been repeatedly criticized (see *People* v. *Romero, supra,* 171 Cal.App.3d at pp. 1154-1156; *People* v. *Rhoades* (1987) 193 Cal.App.3d 1362, 1369-1370 [238 Cal.Rptr. 909]; *People* v. *Bruce* (1989) 208 Cal.App.3d 1099, 1104-1105 [256 Cal.Rptr. 647]), and we decline to adopt it.[3] We hold that a reasonable belief of consent instruction is not required and should not be given where the defense is express consent. In this case it was that and more: defendant's testimony was that the victim actually solicited the acts that occurred.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed, the order of restitution to the victim is stricken, and the case is remanded to the trial court for the limited purposes expressed in this opinion.

Woods (A. M.), P. J., and Taylor, J.,† concurred.

---

[3]Issues relating to the *Mayberry* instruction are now before the Supreme Court in *People* v. *Vasquez* (1991) 7 Cal.App.4th 1691 [281 Cal.Rptr. 661] review granted August 22, 1991 (S021871).

*See footnote, *ante*, page 685.

†Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.