[No. A056838. First Dist., Div. Three. July 20, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
SHAMSHER SINGH et al., Defendants and Appellants.

[No. A060943. First Dist., Div. Three. July 20, 1995.]

In re ALAN L. BURKE on Habeas Corpus.

[No. A063570. First Dist., Div. Three. July 20, 1995.]

In re SHAMSHER SINGH on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts J, K, and L, and the first five sentences of the Disposition.

COUNSEL

David Sundelson, James Jay Seltzer, William Mahannah and Timothy D. Murphy for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Thomas A. Brady and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—Defendants were convicted by jury of multiple felonies. They have raised various claims on appeal and by petitions for writs of habeas corpus. Their primary complaints involve challenges to the sufficiency of evidence; inadequacy of jury instructions; admission of expert testimony, "profile" and "other crimes" evidence; the failure to sever the cases against each for trial; and matters of sentencing. We reject all claims except those relating to sentencing and restitution, which will require preparation of amended abstracts of judgment by the trial court. Otherwise, the judgments are affirmed, and the petitions are denied. Those issues requiring the preparation of an amended abstract are addressed in the unpublished portion of this opinion.

## STATEMENT OF THE CASE

Defendants Shamsher Singh and Alan L. Burke were charged in a fifteen-count indictment with three counts of grand theft (Pen. Code, § 487), one count of attempted grand theft (Pen. Code, §§ 487, 664), three counts of presentation of a false insurance claim (Ins. Code, former § 556, subd. (a)(1)),[1] three counts of fraudulently causing an automobile accident for the purpose of filing a false insurance claim (Ins. Code, former § 556, subd. (a)(3)), one count of preparing a fraudulent writing in support of a false

---

[1]The entirety of Insurance Code section 556 was repealed in 1989. (Stats. 1989, ch. 1119, § 1, p. 4130.) As of January 1, 1987, the statute read in part: "(a) It is unlawful to: [¶] (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss, including payment of a loss under a contract of insurance. [¶] (2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud. [¶] (3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim. [¶] (4) Knowingly prepare, make, or subscribe any writing, with intent to present or use the same, or to allow it to be presented in support of any such claim." (Stats. 1986, ch. 1324, § 1, p. 4675.) Similar statutory provisions criminalizing fraudulent insurance claims can now be found in Penal Code section 550.

insurance claim (Ins. Code, former § 556, subd. (a)(4)), and four counts of illegal referrals for care without valid medical need (Bus. & Prof. Code, § 650).[2] Some of the charges were against one defendant alone, while others were jointly brought. The case arose from a series of automobile accidents, in which Singh was a driver, and the subsequent chiropractic care and insurance billings by Burke, a licensed chiropractor. We set out the charges at length:

| Count | Charge | Dates[3] | Defendant(s) |
|-------|--------|----------|--------------|
| 1 | Ins. Code, § 556, subd. (a)(3)[4] | 10/20/86 - 4/3/87 | Singh and Burke |
| 2 | Ins. Code, § 556, subd. (a)(1) | 4/13/87 - 9/15/87 | Singh and Burke |
| 3 | Pen. Code, § 487 | 5/12/87 - 11/2/87 | Singh and Burke |
| 4 | Ins. Code, § 556, subd. (a)(3) | 4/28/87 | Singh |
| 5 | Ins. Code, § 556, subd. (a)(4) | 5/1/87 - 10/30/87 | Singh and Burke |
| 6 | Pen. Code, § 487 | 7/20/87 - 12/7/87 | Burke |
| 7 | Ins. Code, § 556, subd. (a)(1) | 10/8/87 - 10/22/87 | Singh and Burke |
| 8 | Pen. Code, § 487 | 12/16/87 - 1/12/88 | Singh and Burke |
| 9 | Ins. Code, § 556, subd. (a)(3) | 1/4/88 | Singh |
| 10 | Pen. Code, §§ 487, 664 | 12/13/88 - 2/13/90 | Singh |
| 11 | Ins. Code, § 556, subd. (a)(1) | 12/13/88 - 2/13/90 | Singh |
| 12 | Bus. & Prof. Code, § 650 | 5/29/87 - 7/31/87 | Burke |
| 13 | Bus. & Prof. Code, § 650 | 5/29/87 - 7/31/87 | Burke |
| 14 | Bus. & Prof. Code, § 650 | 5/1/87 - 6/26/87 | Burke |
| 15 | Bus. & Prof. Code, § 650 | 5/1/87 - 7/2/87 | Burke |

The jury found Singh guilty of counts three to five and seven to eleven, and not guilty of counts one and two. The jury found Burke guilty of counts three and six to eight, and not guilty of counts one, two, five, and twelve to fifteen. The court denied probation to both defendants and sentenced both to state prison. This appeal followed.

[2]As of January 1, 1987, Business and Professions Code section 650 read in relevant part: "Except as provided in Chapter 2.3 (commencing with Section 1400) of Division 2 of the Health and Safety Code and in Section 654.1 it shall not be unlawful for any person licensed under this division to refer a person to any laboratory, pharmacy, clinic, or health care facility solely because such licensee has a proprietary interest or coownership in such laboratory, pharmacy, clinic, or health care facility; *but such referral shall be unlawful if the prosecutor proves that there was no valid medical need for such referral.*" (Italics added.) Subsequent amendment is not material to our discussion. (Stats. 1990, ch. 1532, § 1.)

[3]Counts one to three and twelve to fifteen were alleged to be excepted from the usual three-year statute of limitations by Penal Code sections 801.5 and 803, subdivision (c)(6).

[4]Count one is the only count charged under Insurance Code, former section 556 prior to its amendment in 1986, effective January 1, 1987. (Stats. 1986, ch. 1324, § 1, p. 4675.) That amendment renumbered subdivision (3) as subdivision (4) and added a new subdivision (3) regarding the staging of fraudulent accidents. (Stats. 1979, ch. 556, § 1, pp. 1764-1765.)

## STATEMENT OF FACTS

Because of the issues raised on appeal, we must set out the evidence adduced at some length.

### *The Collisions and the Chiropractic Care*

### 1. *The Rear-end Collision (Counts One to Three)*

Just before 6 p.m. on October 15, 1986, Judith Petersen was driving on Alpine Road in San Pablo. She was traveling 15 to 18 miles per hour; it was daylight. As she drove into a blind curve, she struck the rear of Singh's car, which was stopped in the lane in front of her with no brake lights on. Petersen approached Singh's car and knocked on the window, but he would not respond to her. There were four other occupants in the car. Petersen testified to causing minor damage to the right-rear fender of Singh's car.

When Officer Mayes arrived on the scene, Singh and his passengers all indicated they were not injured. Mayes determined that Petersen had been at fault and there was only minor damage to Singh's car.

As a result of this collision, Shamsher, Amarjit, Daler, Ranjodh, and Satnam Singh[5] all sought treatment at Burke's Hilltop Chiropractic Accident and Industrial Injury Clinic and his Bay Area Medical-Legal Thermographic Laboratory.[6]

Singh had 44 chiropractic appointments between October 20, 1986, and February 17, 1987; 11 of these were billed as "routine brief treatment." The total billing was $3,438.86. He was also given two thermograms,[7] billed at a total of $920.

Amarjit had 28 chiropractic appointments between October 20, 1986, and March 25, 1987; 7 were billed as "routine brief treatment," for a total bill of $2,692.20. He received two thermograms, billed at $920.

Daler had 25 chiropractic appointments between October 20, 1986, and December 12, 1986; 4 were billed as "routine brief treatment," for a total bill of $2,475.34. He received two thermograms, billed at $920.

---

[5]Hereafter, we shall continue to refer to defendant Shamsher Singh by his last name. For clarity sake, we shall refer to those individuals with the same surname by their first names.

[6]The two businesses were located on the same premises.

[7]Thermography is a diagnostic tool, whereby heat-sensitive images are taken of various portions of the body to detect temperature imbalances. Such imbalances can be indicative of injury. Skin temperature is a reflection of blood flow, which is regulated by nerves; impingement on a nerve will affect blood supply and, in turn, body temperature.

Ranjodh had 25 chiropractic appointments between October 20, 1986, and December 22, 1986; 3 were billed as "routine brief treatment," for a total bill of $2,927.12. He received two thermograms, billed at $920.

Satnam had 12 chiropractic appointments between October 20, 1986, and November 14, 1986; 3 were billed as "routine brief treatment," for a total bill of $1,705.04. He received one thermogram, billed at $770.

### 2. The Truck Collision (Counts Four to Eight and Twelve to Fifteen)

At approximately 3 p.m. on April 28, 1987, Michael Prefling was driving an 18-wheeled truck and trailer on interstate 80 in Berkeley. In preparation for merging into the lane to his right, Prefling looked in his rearview mirror and saw no cars in that lane. Another truck driver flashed his own lights at Prefling, signaling that the right-hand lane was clear for Prefling's merge. Prefling activated his right-turn signal and began the merge. When he was three-quarters of the way into the right-hand lane, Prefling felt a bump. He looked in his rearview mirror and saw a Volkswagen, driven by Singh, swerving as if the driver were attempting to gain control of the car. Both drivers pulled to the shoulder immediately.

Although Singh's car appeared to have been in several previous accidents, the only new damage Prefling saw was two scratches on the left side of the Volkswagen. This damage apparently had been caused by the lug nuts on the truck's right wheels. No one appeared injured. Singh told Prefling that he and his passengers were okay. They waited several minutes, anticipating a highway patrol car might pass. When none did, Singh and Prefling exchanged license and insurance information and left the scene.

Approximately one hour later, Officer Mathias of the California Highway Patrol (CHP) was dispatched to Herrick Hospital in Berkeley. He arrived to find Singh and his passengers in the emergency room, lying on gurneys moaning in pain. A fifth individual, Ben Maharaj, told Mathias that the injured people were his friends, that they had been in a car accident and then driven to his auto body shop, and he had driven them all to the hospital. Singh initially claimed to have been rear-ended by a large truck. He complained of pain in his right leg, back, neck, and left thumb. His three passengers were Daler, Harjit, and Amarjit Singh. Daler complained of rib pain, Amarjit of back and neck pain, and Harjit of pain in his left shoulder.

Following this collision, Singh, as well as Amarjit, Daler, and Harjit Singh, received treatment from Burke.

After this collision, Singh had 54 appointments at Burke's clinic between May 1, 1987, and August 17, 1987; 10 were billed as "routine brief

treatment," for a total bill of $4,597.80. He received two thermograms, billed at $1,120.

Amarjit had 33 appointments between May 1, 1987, and October 6, 1987; 6 were billed as "routine brief treatment,"[8] for a total bill of $3,061.55. The record is unclear as to how many thermograms Amarjit received; however, his thermography bill for this collision was $1,240.

Daler had 28 appointments between May 1, 1987, and October 6, 1987, with 3 billed as "routine brief treatment," for a total bill of $3,065.05. His thermography bill for this collision was $1,190.

Harjit had 44 appointments between May 1, 1987, and August 11, 1987, with 10 billed as "routine brief treatment," for a total bill of $3,955.11. He received two thermograms, billed at $1,120.

### 3. *The Intersection Collision (Counts Nine to Eleven)*

At approximately 4:45 p.m. on January 4, 1988, Mary Briar was driving northbound on College Avenue in Berkeley. She drove into the intersection at Durant Avenue, with a green light. Singh, who had been stopped at the red light for eastbound traffic on Durant, suddenly accelerated into the intersection, striking Briar's car. Neither Singh nor his three passengers appeared or claimed to be injured.

Following this collision, Singh and Sardol Kwatra received treatment from Burke. Singh had 41 appointments between January 9, 1988, and April 25, 1988, with 8 billed as "routine brief treatment," for a total bill of $2,967.01.

### 4. *Other Collisions*

Evidence of other collisions, not the basis of any of the charges in the information, was also admitted. On February 26, 1985, Singh was rear-ended on an exit ramp of interstate 80. Jaspal Singh was in the car with him. Both men were later treated by Burke.

On November 11, 1985, Singh purchased his original insurance policy from Farmers Insurance (Farmers). The next day, Singh sideswiped a truck on interstate 80. Singh's passenger, Malkit Singh, sued him and recovered a settlement. Both men were treated by Burke following this collision.

---

[8]One date of treatment (June 12, 1987) showed a double billing for "routine brief treatment."

On August 5, 1986, Singh ran a stop sign in Berkeley and hit another car. He was not injured and did not see Burke.

On April 20, 1988, Singh drove into an intersection through a flashing red light and was struck by another car. Singh received his last treatment from Burke for the intersection collision on April 25, 1988. On that date, Burke prepared a return-to-work form, clearing Singh to return to work on April 28. Also on that date, Singh completed a new patient questionnaire relating to the April 20 collision. On that questionnaire, he indicated he had no previous physical complaints. Burke treated Singh for the April 20 collision between May 2 and May 9.[9] No insurance claim was filed in connection with this last collision.

### Burke's Billing Procedures

There was evidence that Dr. Burke manipulated the billing procedures to secure inflated payment. Burke's printed billings set out the treatment, the cost of each service, and the relative value schedule (RVS) code numbers. RVS code numbers are standardized for use by the health care industry and by insurance companies to regulate billing procedures and costs. Each type of service has a code number corresponding to that service's unit value. The unit value is multiplied by a factor in order to determine the cost of the procedure.

The RVS code for "routine brief treatment" is 90040. The RVS code for missed appointments, 99049, has no unit value associated with it; instead, the value is determined on a case-by-case basis. Insurers require a care provider to explain in writing why they are charging for a missed appointment. This evidence was relevant given Burke's custom of billing missed appointments as "routine brief treatment." "Routine brief treatment" was billed at $22 per treatment. The total number of no-shows by the Singhs billed as "routine brief treatment" was 28 ($616) following the rear-end collision and 29 ($638) following the truck collision.

The RVS code for 30 minutes of therapy is 97200. For each additional 15 minutes of therapy, the RVS code is 97201. Consequently, 45 minutes of therapy should be billed using both codes. For instance, 30 minutes of physical therapy with the doctor followed by a 30-minute massage by the massage therapist should be billed using 97200 and two 97201's. The unit value for the initial 30 minutes of care is greater than twice the unit value for an additional 15 minutes, because the unit value for the initial 30 minutes includes the various fixed overhead costs of the visit itself.

This evidence was relevant given Burke's custom of having his employees postdate massage therapy. The patient's bill would show an office visit with

---

[9] Investigators served a search warrant on Burke's office on May 11, 1988.

the doctor on one day, and a massage with the massage therapist the next day, even though both treatments had occurred on the same day. This custom allowed Burke to bill for two office visits, each with attendant overhead components, rather than billing for one office visit with an additional 30 minutes of treatment.

Following the rear-end collision, the Singhs received 13 massages. Each time the massage therapy was postdated, the patient's bill was inflated by $16.10,[10] for a total of $209.30. Following the truck collision, the Singhs received 22 massages, resulting in a total bill inflation of $353.20.

Arterial doppler ultrasounds and plethesmographies were two diagnostic tests used by Burke and billed at $75 each. The Singhs received a total of 15 such tests ($1,125) following the rear-end collision and 11 ($825) following the truck collision.

Following the truck collision, each of the Singhs was prescribed a transelectrical nerve stimulation (TENS) unit[11] for pain reduction. The total chiropractic bill for each patient included $1,025 for the combined cost of the rental and sale of these units.

The evidence showed that Burke's patients were classified as "workers' compensation," "Medicare," or "group insurance" patients, whose treatment would be paid for under the provisions of each particular system; "personal injury" patients, who had been in an accident and were likely to be plaintiffs in litigation; or "cash-paying" patients, who were personally responsible for payment.

### The Insurance Claims

Attorney David Farling represented all of the Singhs in their personal injury suit against Petersen's insurer, Farmers. The evidence established an interesting billing practice in personal injury cases. Rather than sending a statement to his patients, Burke sent the bills directly to the patients' lawyers. Settled claims, in turn, were paid to Burke by the lawyers, not by check from the insurance company to Burke.[12] In his demand letters to Farmers, Farling submitted Burke's bills, as outlined above, and offered to

---

[10]Rather than billing the 30-minute massage as 2 consecutive periods of an additional 15 minutes of therapy, valued at $9.95 each, Burke billed for a new 30 minutes of treatment at $36, resulting in a $16.10 overcharge each time.

[11]A device worn by the patient that delivers electrical impulses to the muscle.

[12]An exception to this practice is noted, *post*, whereby bills for automatic coverage (the "med-pay" provisions) were sent directly to the insurance company by Burke, and the payment was sent directly to Burke by the insurance company.

settle each claim for a specified amount: Singh, $15,100; Amarjit, $12,100; Daler, $11,500; Ranjodh, $12,700; and Satnam, $15,000.[13] Farmers settled each of these claims. We set out the settlements, as well as their distribution:

| Total Settlement | | Attorney Fees & Costs | Burke: Chiropractic/ Thermographic | Net to Patient |
|---|---|---|---|---|
| Singh: | $7,350 | $2,094.92 | $3,135.08/$920 | $1,200 |
| Amarjit: | $6,200 | $1,941.58 | $2,388.42/$920 | $ 950 |
| Daler: | $5,900 | $1,904.66 | $2,125.34/$920 | $ 950 |
| Ranjodh: | $6,600 | $2,152.88 | $2,577.12/$920 | $ 950 |
| Satnam: | $8,500 | $3,534.40 | $1,705.04/$770 | $1,818.06[14] |

Farmers also paid Singh $2,500 to settle his separate claim for property damage to his car. An adjuster for Farmers examined Singh's car. He noted extensive damage beyond that reflected in the police report and that much of the damage looked old. However, several months had passed since the collision with Petersen, and Singh claimed all of the damage was, in fact, due to that collision. The adjuster decided to pay the claim.

During the adjuster's initial efforts to locate Singh, he discovered that the three addresses listed for Singh on the police report, the insurance loss report, and with the insurance agent did not exist. He finally located Singh through his attorney.

The adjuster also testified he was unaware when he paid the personal injury claims that Burke had manipulated the billing entries. Had he so known, he would not have paid those portions of the bill.

On the day following the truck collision, the Singhs retained Attorney Ralph Baker to represent them on their personal injury claim. Each of the Singhs gave Baker the same home address. After Baker received the police report in which Singh was deemed at fault for the collision, he became concerned that either Singh or Dr. Burke would incur expenses that would not be reimbursed because of the weak liability claim and so informed Burke of this concern in a letter dated May 20, 1987. Burke immediately told his staff to schedule concluding examinations for the Singhs, not to schedule X-rays or thermograms, and to prepare to release them as patients.

Thereafter, Timothy Gill, Farling's law partner, received a phone call from Dr. Burke, who said that Singh was dissatisfied with his current lawyer, Baker. Singh then told Gill he had been rear-ended in the truck

---

[13]Satnam's proposed settlement included the cost of additional medical treatment he had received from other doctors.

[14]The remainder of this settlement, $672.50, was distributed to other doctors.

collision. Gill took over the representation of Singh in his personal injury suit against Industrial Indemnity, Prefling's insurer.

Gill also assumed the representation of Amarjit, Daler, and Harjit in their personal injury claims. Because Industrial Indemnity was denying Prefling's liability, the claims by Amarjit, Daler, and Harjit were against Singh's insurer, Farmers.

Gill sent demand letters to the respective insurers on behalf of each of the Singhs. These letters included the chiropractic expenses by Burke and made specific settlement offers: Singh, $15,000; Amarjit, $17,500; Daler, $16,500; and Harjit, $15,500.

Farmers was initially concerned that all the Singhs might be related or living together, because there was a familial exclusion on Singh's insurance policy that prevented settlement of claims brought by individuals who either lived with or were related to the insured. Singh emphatically told Gill he neither lived with nor was related to the other Singhs. Gill prepared declarations to that effect, which were signed by each of the Singhs and forwarded to Farmers. Although Gill's files contained the same address for each client, Gill testified the addresses were the same because, of the four, only Singh spoke English and he directed Gill to send all correspondence to his home.

Farmers and Industrial Indemnity ultimately settled the claims as follows:[15]

| Total Settlement | | Attorney Fees & Costs | Burke: Chiropractic/ Thermographic | Net to Patient |
|---|---|---|---|---|
| Singh: | $ 9,250 | $2,966.75 | $4,655.39/$1,120 | $ 507.86 |
| Amarjit: | $12,000 | $4,056.75 | $3,061.55/$1,240 | $3,641.70 |
| Daler: | $12,000 | $4,056.75 | $4,255.03[16]/$1,190 | $2,498.22 |
| Harjit: | $12,000 | $4,056.75 | $3,955.11/$1,120 | $2,868.14 |

Following the intersection collision, Singh sued for personal injury. He told Briar's lawyer he would dismiss the complaint if Briar's insurance

[15]Singh's policy provided for immediate coverage of medical expenses (a "med-pay" provision) up to $2,000 for each occupant of the car. Consequently, the total settlement for each individual includes the initial $2,000 from Farmers plus the final disbursement from either Industrial Indemnity or Farmers. The relative-exclusion did not apply to the med-pay provision. The bills and subsequent payment for the med-pay coverage were exchanged between Burke and Farmers directly.

[16]Burke was compensated twice for the thermographic work on Daler. This additional $1,190 was not refunded to Farmers.

company, Ohio Casualty, paid his medical bills. Thereafter, Singh failed to pursue the lawsuit and failed to respond to interrogatories. The complaint was ultimately dismissed by the court.

## The Employees and Patients

Dr. Grover Compton, a licensed chiropractor, was employed by Burke between 1985 and 1987. At the time of his testimony, he was working as an insurance claims adjuster. He testified as both a percipient witness and an expert, specifically as to the identification of injuries and appropriateness of treatment. During his employment with Burke, Compton generally conducted the initial examinations of patients and gave thermograms.

Compton concluded, based upon his own initial examinations of the Singhs and their thermograms, that there was no serious injury and Burke's treatment of the Singhs was excessive. Later, he conceded that not only had he, on occasion, treated the Singhs at Burke's direction, but that he also had contributed, by his initial diagnostic testing, to the number of Burke's treatments. He also conceded the treatment charts for Ranjodh and Satnam Singh, following the rear-end collision, revealed possible injury, and he could not say either of them had been overtreated. He also said the treatment charts for Daler and Amarjit Singh, following the truck collision, showed objective evidence of injury.

More generally, Compton testified that many patients were overtreated by Burke. Specifically, thermography and X-rays were used inordinately on personal injury and workers' compensation patients. He did not recall a cash-paying patient ever receiving thermography. Personal injury patients were usually given a thermogram at the beginning of treatment. Compton opined that, although thermography could be a useful diagnostic tool, it should not be used until approximately three weeks into treatment to see if the patient responds to the initial treatments. All personal injury patients were also prescribed a TENS unit at the outset of treatment. These units were initially rented on a 30-day trial basis and later sold to the patient. Compton opined that both the rental and sale cost were excessive. Compton conceded that insurance companies do not like thermography because of its ability to diagnose and/or confirm soft-tissue injury and that Burke has been one of the leading promoters of thermography. Compton testified to Burke's practice of manipulating billing codes and explained this was done to ensure insurance payments.

Cathy Kimura was a friend of Singh's between September 1986 and November 1987. Singh never appeared to be injured and was even capable of swimming and playing the drums vigorously during this period. Kimura was in a car accident in the summer of 1987. Singh told her it was easy to recover money for an accident and that he was going to collect $10,000 for one. At Singh's suggestion, Kimura went to see Burke and Farling. Singh told her he was receiving referral fees from Burke. Kimura ended her friendship with Singh when he insisted on becoming more than friends. She eventually had to obtain a restraining order when Singh persisted. She admitted that she first came forward with her information out of revenge against Singh.

Vera Mahnken was the massage therapist at the clinic from November 1986 until the summer of 1988. Burke directed her to manipulate the billing forms but changed this procedure following the service of a search warrant by the CHP. Mahnken quit because she felt that, at Burke's direction, she often treated patients who did not need her services. She had a salary dispute with Burke following her departure.

In January 1987, Janice Gori went to Burke after her own car accident. Burke suggested she get an attorney and referred her to Farling. Burke also paid her $200 for each new patient she referred to him, as long as the patient's medical insurance paid for thermography. Burke fired her daughter, Leigh Scilingo, who had worked as his receptionist.

Scilingo first saw Burke as a patient in January 1987. She then became his receptionist and billing clerk in June 1987. She testified to Burke's customary billing irregularities and to the inordinate number of missed appointments by the Singhs. Cash-paying patients were not billed for no-shows. She testified that personal injury and workers' compensation patients were given the full battery of diagnostic tests, were all given TENS units, and were seen more regularly than other patients. She could not recall a cash-paying patient receiving thermography.

Stacy Greengard, also a former billing clerk for Burke, confirmed Scilingo's testimony as to the billing practices and Burke's instructions. Greengard had also been fired.

Three patients testified Burke gave them effective care over extended periods. None had ever experienced any irregularity involving the billing for Burke's services; however, two were workers' compensation patients and the third was covered by group insurance.

*The Experts*

1. *For the Prosecution*

Chiropractor Stephen Foreman testified that the chiropractic treatment of the Singhs had been "cookie cutter" in nature, suggesting identical treatment not particularized to patient needs. As to thermography, he testified that only a few chiropractors use it as a diagnostic tool and that it should be used, if at all, as a last resort and not at the outset of treatment as Burke had done. Foreman also testified that Burke had misprescribed two other diagnostic procedures: arterial doppler ultrasound and plethesmography. Both are sophisticated techniques for gauging blood flow to determine structural abnormalities. Foreman opined that chiropractors are not ordinarily trained to use such techniques and cannot reasonably employ the results in treatment.

Officer Mitchell was qualified as an expert in the field of staged collisions and their relationship to insurance fraud. She had been an officer with the CHP for 8 years and had received 80 hours of training regarding traffic collisions in the academy, 120 hours of training in advanced accident investigation, and 75 hours of training in white collar crime, including insurance fraud through staged collisions. She had investigated between 750 and 1,000 accidents and, for the last 4 years, had been a staged-collision investigator for the CHP. She had taught both law enforcement and insurance industry personnel about staged collisions and fraudulent insurance claims and was the president of the Northern California Fraud Investigators Association.

Mitchell concluded the three charged collisions had been staged. She relied on several factors: (1) in two of the collisions, Singh was driving an older car with significant prior damage; (2) there were always multiple passengers in the vehicle; (3) all of the passengers went to Burke for care; (4) there was a referral relationship between Burke and the law firm representing the Singhs; and (5) injuries were claimed later, though not at the scene. In reaching her opinion, Mitchell reviewed the police reports and insurance claim files.

Officer Mathias, who had personally investigated the truck collision, was qualified as an expert in accident investigation and associated injuries. He, too, had been a CHP officer for eight years and had investigated approximately four hundred accidents. He had received training in accident investigation and the identification of injuries associated with different types of accidents.

Mathias opined the truck collision was staged. He based his opinion primarily on the fact that the injuries complained of were far more severe

than the physical evidence of the accident would indicate. He also considered Singh's withdrawal of the allegation that he had been rear-ended, when confronted with the physical evidence. Mathias recognized the damage to Singh's car as that ordinarily caused by the lug nuts of a truck during a side collision, based upon the 30 to 40 previous accidents he had investigated with similar damage. He did not consider any of the medical diagnoses or treatment in forming his opinion.

Officer Del Marmol was qualified as an expert in staged collisions and insurance fraud. He had been a CHP officer for nearly 25 years, during which time he had investigated over 1,000 accidents. He had received special training in accident investigation, accident reconstruction, and fraud investigation. He had investigated over 100 staged collisions, taught courses on that subject, published articles, and testified both in courts and before the Legislature.

Del Marmol opined that, with the exception of the first uncharged accident on February 26, 1985, all of Singh's accidents were staged for the purposes of establishing property damage or personal injury insurance claims. His opinion was based solely on the collision reports from the various accidents and statements made by the parties involved. He conducted no independent investigation of the scenes or vehicles involved.

Del Marmol concluded the November 12, 1985, collision was staged because Singh claimed he was rear-ended, when the damage, in fact, was to the left-rear side of Singh's car. He concluded the August 5, 1986, collision was staged because the police report indicated Singh accelerated into the intersection, while Singh claimed he was decelerating at the time of the collision.

Del Marmol's conclusion that the rear-end collision of October 15, 1986, was staged was based upon several factors: (1) before Petersen hit him, Singh had not stopped as close as was practical to the intersection, in preparation for his left-hand turn; (2) Singh claimed Petersen was traveling at 35 miles per hour at the time of the collision, which would have caused more severe damage; (3) Singh did not respond to Petersen when she approached his car; and (4) Singh claimed no injuries at the scene.

Del Marmol's conclusion that the truck collision was staged was also based upon several factors: (1) the similarity between this collision and the collision of November 12, 1985, including the discrepancy between the location of the damage and Singh's account of the collision; (2) the damage pointed out to Officer Mathias by Singh was old and rusty; and (3) both

drivers indicated they had no prior warning of the impending accident, such that greater damage to Singh's vehicle would be expected given the high speeds of the vehicles on the freeway. This last factor led Del Marmol to conclude that Singh was aware of the impending accident and, in fact, intended the accident.

Del Marmol concluded the intersection collision was staged because Singh accelerated into the intersection against a light that had been red for some time. Del Marmol also noted the similarity between this collision and the collisions of August 5, 1986, and April 20, 1988.

Finally, Del Marmol testified that his conclusions about these accidents were based upon the accidents taken as a whole and their relationship to one another.

## 2. *For the Defense*

Dr. Schiffer, a neurosurgeon, testified as an expert in thermography and its importance in his work. He uses thermography, however, only during surgery and not as an outpatient diagnostic procedure.

Dr. Ellis, a neuropsychiatrist and an expert in thermography, agreed with Dr. Schiffer's testimony about the beneficial use of thermography during surgery. He went on to describe its importance as a tool for diagnosing pain. Ellis, however, uses thermography on only 5 percent of his patients and never immediately, but instead after six to eight weeks to gauge the effects of initial treatment. He does not use either arterial doppler ultrasound or plethesmography in his practice.

Dr. Risley, a chiropractor, testified as an expert in temperature gradient studies, such as arterial doppler ultrasound and plethesmography. He does not use thermography in his practice because he gets similar, in fact more specific, information from the other temperature gradient studies. Risley uses temperature gradient studies on virtually all of his patients to diagnose injury and recommends the studies be conducted as early as possible in the patient's treatment. He agreed with Dr. Foreman that the onset of pain from low-impact injury can be delayed several days. He also prescribes TENS units for his patients, though not as a matter of course.

Dr. Francis, a physician and member of the American Academy of Neuromuscular Thermography, testified he uses thermography as a diagnostic tool on 70 to 80 percent of his patients within two to three weeks of treatment. He also prescribes TENS units to his patients.

Dr. Farris, a chiropractor, testified he employs thermography at the outset of patient care and uses follow-up thermography to monitor the patient's progress. He does not use arterial doppler ultrasound or plethesmography. He also testified that RVS codes are not well geared to his own practice, such that some of Burke's billing practices could easily be employed without fraudulent intent.

Gerald Tunney, a plaintiff's attorney, testified as an expert in personal injury suits and settlement of claims. He testified that the insurance industry dislikes thermography because it can be used to substantiate the soft-tissue injuries of claimants. He also testified that the standard of care relevant in medical malpractice cases involves consideration of whether the doctor used all diagnostic tools available to him before treating a patient.

Paulette Stiller, a claims adjuster, testified as an expert in the adjustment and settlement of insurance claims. She testified that some of Burke's billing techniques were not necessarily fraudulent and that the adjuster would be responsible for inquiring further to clarify the nature of the treatment provided.

### The Defendants

Officer Mitchell testified about her interview with Singh. As to the rear-end collision, Singh claimed he was stopped in the left-hand turn lane with his blinker on when Petersen hit him. Singh claimed the truck collision was not his fault and that he had told Prefling he and his passengers were injured. His friend Maharaj, who just happened to be driving by on the freeway, stopped and took them to the hospital.[17] Singh also admitted that Amarjit, Daler, and Harjit were his brothers, that they lived with him at the time of the accident, and that he had helped his attorney prepare the declarations for Farmers. As to the intersection collision, Singh claimed he entered the intersection on the yellow light and that he told Briar he and his passengers were injured.

Dr. Burke himself testified and was received by the court as an expert in chiropractic medicine, thermography, arterial doppler ultrasound, and plethesmography. He is a licensed chiropractor in California, a diplomate of the National Chiropractic Board, and a certified workers' compensation disability evaluator. He is also a founding member and former president of both the International Thermographic Society and the California Thermographic Society, and a member of the American Herschel Society, a thermographic academy of medical doctors and chiropractors. He is a former

---

[17]This point was contradicted by the repair estimate from Maharaj's auto body shop, dated the same day as the accident, and is inconsistent with the statement given by Maharaj.

vice-president of the Thermographic College of the American Chiropractic Association. He testified before the State Board of Chiropractic Examiners regarding thermography, helping secure their approval of thermography as a diagnostic tool. He has testified in court as an expert in thermography and long been an instructor on the use of thermography. He has been trained in the use of arterial doppler ultrasound and plethesmography and is a diplomate of the American Academy of Pain Management, which includes training in the use of TENS units.

He testified specifically to his treatment of Singh following the rear-end collision. He began treatment on October 20 but did not employ thermography until November 12, when Singh's low-back pain would not resolve. All of the Singhs made subjective complaints of injury to him following the rear-end and truck collisions, and he was able to confirm those injuries through objective findings. He had no reason to believe they were feigning injury; they never told him the collisions had been staged. He claimed his policy of billing for massage therapy the day following treatment was a matter of convenience for the therapist, who could then submit all of her fee slips at one time the following morning, and that he did not make more money as a result of this policy.

### The Verdicts

### 1. The Rear-end Collision

Both defendants were acquitted of count one (Ins. Code, former § 556, subd. (a)(3)) and count two (Ins. Code, former § 556, subd. (a)(4)), involving a fraudulent claim of insurance and the preparation of documents in support of the claim arising out of the rear-end collision. Both were convicted of count three (Pen. Code, § 487), grand theft from Farmers, relating to the settlements for that collision. For proof of this count, the prosecutor relied upon the checks issued by Farmers and the disbursements of those funds to both Burke and the Singhs between May 12 and November 2, 1987.

### 2. The Truck Collision

Singh was convicted in count four of causing the truck collision for the purpose of presenting a fraudulent insurance claim. (Ins. Code, former § 556, subd. (a)(3).)

Singh was convicted in count five of preparing fraudulent writings in support of that claim. (Ins. Code, former § 556, subd. (a)(4).) The prosecutor relied upon the declarations by each of the Singhs that they were not related

and did not live together as evidence of this count. Burke was acquitted of count five. As to Burke, the prosecutor had relied upon the billings for chiropractic treatment.

Burke was convicted in count six of grand theft from Farmers. (Pen. Code, § 487.) The basis of this conviction was the disbursement of funds to Burke between July 20 and December 7, 1987, following the claims against Singh's insurance policy by Amarjit, Daler, and Harjit.

Both defendants were convicted in count seven of presentation of fraudulent insurance claims. (Ins. Code, former § 556, subd. (a)(1).) The prosecutor relied upon the demand letters from Gill to Farmers and Industrial Indemnity between October 8 and October 22, 1987, as the principal evidence of this count.

Both defendants were convicted in count eight of grand theft from Industrial Indemnity. (Pen. Code, § 487.) The prosecutor relied here upon the payments to Singh and Burke between December 16, 1987, and January 12, 1988, following Singh's claim against Prefling's insurance policy.

Burke was acquitted in counts twelve to fifteen of referring each of the Singhs for treatment to Bay Area Thermographic without valid medical need. (Bus. & Prof. Code, § 650.)

### 3. *The Intersection Collision*

Singh was convicted in count nine of staging a fraudulent vehicular collision with Briar in the intersection. (Ins. Code, former § 556, subd. (a)(3).)

In count ten, Singh was convicted of attempted grand theft (Pen. Code, §§ 487, 664), based upon his claim against Mary Briar and her insurance company, Ohio Casualty.

In count eleven, Singh was convicted of filing a false insurance claim based upon his filing of the civil complaint against Briar.

### *Sentencing*

Burke was sentenced to two years in state prison and ordered to pay a $500 restitution fine and $20,460.51 in direct restitution. The court chose the midterm of two years on count three as the principal term and sentenced Burke to two years concurrently on each of counts six to eight.

Singh was sentenced to five years and eight months in prison and ordered to pay a $500 restitution fine. The court chose the aggravated term of four years on count four as the principal term and then added one year (one-third the midterm) for count eleven and eight months (one-third the midterm) for count three. Singh was sentenced concurrently on the remaining counts: two years each for counts eight and ten; three years each for counts five, seven, and nine.

## DISCUSSION

### A. *Theft by False Pretenses*

Burke was charged in counts three, six, and eight with grand theft (Pen. Code, § 487) on a theory of false pretenses.[18] ■ He alleges his convictions in those three counts must be reversed because there was no evidence that he or his agents made false representations directly to the insurance companies or their agents. His claim fails.

Burke is guilty of theft by false pretenses if he made a false representation or intentionally *caused one to be made. Smith* v. *Superior Court* (1970) 5 Cal.App.3d 260 [85 Cal.Rptr. 208] is on point. There, the defendant, the owner of an ambulance company, made fraudulent claims for reimbursement to the state Medicare program. The defendant sent his claims directly to Blue Shield, a nongovernmental agency, for processing. Blue Shield then routed the claims to the state for approval. When the claims were approved, funds were routed through Blue Shield's bank account to the defendant. The defendant was charged with presenting false claims to a state agency (Pen. Code, § 72). He argued there was technically no violation of Penal Code section 72 because he had not made false claims to a state agency. The court disagreed: "Both sides argue whether Blue Shield was the state's agent or petitioner's agent in presenting the false claims to the state. We do not see that it makes any difference since the gravamen of the offense lies in petitioner's ultimate objective that the claims be filed with the state and that he be paid by the state. Smith cannot absolve himself of his guilt in using

---

[18]The jury was instructed in part: "In order to prove such crime, each of the following elements must be proved: [¶] 1. A person made or caused to be made to another person, by word or conduct, either (1) a promise without intent to perform it or (2) a false pretense or representation of an existing or past fact known to such person to be false, or made recklessly and without information which would justify a reasonable belief in its truth, [¶] 2. Such person made the pretense, representation or promise with the specific intent to defraud, [¶] 3. The pretense, representation or promise was believed or relied upon by the other person and was material in inducing him or her to part with his or her money or property even though the false pretense, representation or promise was not the sole cause, and [¶] 4. The theft was accomplished in that the other person parted with his or her money or property intending to transfer ownership thereof."

Blue Shield as a conduit to siphon off state funds through false claims that require state approval before payment. [¶] In short, when petitioner filed the false claims he knew that they had to be presented to a state agency for approval, and that the claims, if approved, would be paid from state funds. Thus he intended that the claims be forwarded to the state agency, and when that event occurred he violated section 72. It matters not whether he presented the claims directly to the state or indirectly through Blue Shield; there was no way he could succeed in getting the money without violating the section." (*Smith* v. *Superior Court, supra,* at pp. 263-264.)

Here, the lawyers, like Blue Shield, were the conduit for the fraudulent claims. Burke sent the billings to the attorneys, knowing they were representing his patients in their personal injury claims and knowing they would forward the billings to the insurers. We assume, arguendo, that Burke knew the billings were fraudulent, as Burke himself does for purposes of this argument. He must then have known he would ultimately be defrauding the insurers by sending the billings to the law firm. Indeed, his billing practices were tailored to facilitate insurance payment. He cannot now hide behind the firm to avoid guilt. We note the jury was instructed that, in order to be guilty, Burke must have harbored the specific intent to defraud the insurers. The jury's guilty verdict reflects that they found Burke intended to defraud the insurers when he sent the billings to the law firm.[19]

### B. *Presentation of Fraudulent Insurance Claim*

Burke also urges reversal of his conviction in count seven of presenting or causing to be presented a fraudulent insurance claim, represented by the demand letter from Gill to Industrial Indemnity. For purposes of this argument, Burke again concedes the claim was fraudulent, arguing only that he neither presented it nor caused it to be presented. ■ Burke contends that only the insured or his attorney who prepared the demand letter can be liable under Insurance Code former section 556, subdivision (a)(1). The care provider could only be liable for preparing fraudulent writings in support of a false claim, a violation of Insurance Code former section 556, subdivision (a)(4). Burke further notes that he was acquitted in count five of violating Insurance Code former section 556, subdivision (a)(4), a charge pertaining to this same claim.

Can the care provider, whose billings form the basis of such a fraudulent claim actually tendered by another party, be said to have *caused the*

---

[19]Burke also sent claims directly to Farmers following the truck collision and received money directly from Farmers by way of the med-pay provisions. We need not consider these direct claims given our resolution of Burke's liability for the indirect claims.

*presentation of* the fraudulent claim? The question appears to be one of first impression, and we answer in the affirmative. The reported cases on this topic all involve the culpability of the insured or his attorney who actually presented the claim to the insurer. (See, e.g., *People v. Petsas* (1989) 214 Cal.App.3d 70 [262 Cal.Rptr. 467]; *People v. Marghzar* (1987) 192 Cal.App.3d 1129 [239 Cal.Rptr. 130]; *People v. Scofield* (1971) 17 Cal.App.3d 1018 [95 Cal.Rptr. 405].) Insurance Code former section 556, subdivision (a)(1) makes liable both those who present fraudulent claims and those who *cause them to be presented.* We must interpret the phrase "cause to be presented" in a way that avoids rendering it surplusage. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1010 [239 Cal.Rptr. 656, 741 P.2d 154].) Consequently, the statute must reach those who present claims and anyone who intentionally, by their actions, causes the fraudulent claim to be presented. If this provision could only be violated by the person who actually presented a claim, the phrase "or cause to be presented" would be unnecessary. In order for the phrase to have meaning, a person may violate this section if he intentionally acts to cause another to present a fraudulent claim. Here, the evidence shows Burke did precisely that under the same analysis set out in part A, *ante.*

Burke next contends that such a reading of the statute required the jury to be instructed on proximate cause, which was not done here. We disagree. Burke relies upon two cases, both of which are easily distinguished. In both *People v. Roberts* (1992) 2 Cal.4th 271 [6 Cal.Rptr.2d 276, 826 P.2d 274] and *People v. Bernhardt* (1963) 222 Cal.App.2d 567 [35 Cal.Rptr. 401] the criminal result was not intended by the defendant. Here, the jury was instructed that in order to find a violation of Insurance Code former section 556, subdivision (a)(1), they must find not only that Burke presented or caused to be presented a fraudulent claim, but also that Burke did so with the specific intent to defraud.[20] As evidenced by their verdict, the jury found Burke had specifically intended the criminal result, i.e., to defraud Industrial Indemnity. On the facts of this case, no special instruction on proximate cause was required where the jury necessarily found that Burke had both directly caused the criminal result and specifically intended to do so.

## C. *Intent to Defraud*

As noted above, Burke's convictions for violating Insurance Code former section 556, subdivision (a)(1) (count seven) and Penal Code section 487

---

[20]The jury was instructed: "An intent to defraud is an intent to deceive another person for the purpose of gaining some material advantage over that person or to induce that person to part with property or to alter that person's position to his or her injury or risk, and to accomplish that purpose by some false statement, false representation of fact, wrongful concealment or suppression of truth, or by any other artifice or act designed to deceive."

(counts three, six, and eight) all required proof of a specific intent to defraud. ■ He argues there was insufficient evidence of such an intent. We disagree.

■ An intent to defraud may be determined by consideration of all the circumstances in evidence. (*People* v. *Scofield, supra,* 17 Cal.App.3d at p. 1025 [involving a violation of Ins. Code, former § 556, subd. (a)].) " 'It is well established that criminal intent may be inferred from the general circumstances surrounding the transactions, and that other similar transactions carried on by a defendant are sufficient to prove guilty knowledge and criminal intent.' [Citations.]" (*People* v. *Smith* (1984) 155 Cal.App.3d 1103, 1148 [203 Cal.Rptr. 196] [involving a charge of theft by false pretenses].) ■ We, of course, review the entire record in a light most favorable to the judgment to determine if there is substantial evidence of defendant's guilt beyond a reasonable doubt. (*People* v. *Marghzar, supra,* 192 Cal.App.3d at p. 1137.)

■ Burke's intent to defraud must rest upon his knowledge that his billings were fraudulent. The prosecution tried to prove the billings were fraudulent in various respects. First, Burke overtreated his patients by using medically unnecessary diagnostic tests (thermography, arterial doppler ultrasound, and plethesmography) and pain therapies (the TENS units). Second, Burke overcharged for the TENS units and had overbilled in various ways.

Burke was acquitted in counts twelve to fifteen of referring each of the Singhs to his own thermographic laboratory without valid medical need. (Bus. & Prof. Code, § 650.) We agree with Burke that these verdicts indicate the jury was not convinced beyond a reasonable doubt that there was no valid medical need for the thermography, given that the other elements of the offense were conceded by Burke. However, such an implicit finding by the jury does not mean that it believed the arterial doppler ultrasound and plethesmography testing was medically valid. Burke did not refer the Singhs to a laboratory in which he had an interest for the arterial doppler ultrasound and the plethesmography. That testing was done by Burke in his offices and was billed as services by Hilltop Chiropractic. Furthermore, the prosecutor relied only upon the thermographic testing billed by the Bay Area Medical-Legal Thermographic Laboratory for proof of counts twelve to fifteen.

There was testimony from prosecution witnesses that Burke's use of arterial doppler ultrasound and plethesmography was unnecessary and indiscriminate. Although there was contrary testimony as to the value of such testing, the jury was free to reject that testimony. We note that several of the *defense* witnesses gave testimony that cast suspicion on Burke's extensive

use of these diagnostic tests. Dr. Ellis, who uses thermography extensively, does not use either the arterial doppler ultrasound or plethesmography. Dr. Risley, who uses arterial doppler ultrasound in his chiropractic practice, admitted there was not much interest in that technique in the profession and that he uses plethesmography with far less frequency than arterial doppler ultrasound. Furthermore, he testified he did not use thermography because he obtained similar diagnostic information from the arterial doppler ultrasound, suggesting the use of thermography would obviate the need for other temperature gradient studies. Dr. Farris, who uses thermography extensively in his chiropractic practice, does not use either arterial doppler ultrasound or plethesmography.

While all the experts agreed that TENS units were useful to counteract pain of some kinds, the evidence raised questions as to Burke's prescription of the units for each of the Singhs. The evidence was inconclusive as to whether Burke had overcharged for the sale or rental of the TENS units. There was substantial evidence, however, that he overprescribed their use. Dr. Compton testified that all personal injury patients were prescribed TENS units. Stacy Greengard confirmed that all personal injury patients received a TENS unit and added that no cash-paying patients received them. Dr. Risley testified that he would not automatically prescribe a TENS unit. Following the truck collision, the Singhs were each prescribed a TENS unit on the same day, June 23, 1987.

There was no evidence that Burke had inappropriately billed 30 minutes of care as 45 minutes of care. However, the evidence was uncontradicted that he billed no-shows as "routine brief treatment" and postdated massage therapy by one day. While he claimed that both were matters of convenience not meant to deceive the insurance company, the evidence is otherwise.

Burke testified he used the "routine brief treatment" code for no-shows because it represented the minimum charge available and was fair compensation for his wasted time. While Burke might be entitled to payment from patients who failed to keep scheduled appointments, insurance companies would not be responsible for reimbursing him for missed appointments. It bears noting that cash-paying patients were never charged for missed appointments. Burke further claims on appeal that it was the responsibility of the lawyers to subtract the cost of the missed appointments from Burke's bill before making the demand of the insurer. To this end, Burke testified he told the attorneys that "routine brief treatment" indicated a missed appointment. Both Gill and Farling denied that Burke had given them this information. The testimony of Gill and Farling is supported by the fact that none of the bills sent by Burke to the attorneys contained this information.

Burke testified that the postdating of the massage therapy treatments was for the convenience of the therapist, who would bring all of her day's fee slips to the billing clerk at one time the following morning. While this may explain why the fee slips were not delivered to the billing clerk until the day after treatment, it does not explain why the billing showed the treatment as having occurred the day after actual treatment. The overwhelming evidence from Burke's employees was that they were instructed to bill the treatment for the following day for insurance purposes. Additionally, massage therapy was only conducted every other day, so the therapist would have to give the fee slips to the billing clerk on either the actual day of treatment or two days later.

Burke also testified that he wanted the massage therapy postdated so that the insurance company would not think he had merely double-billed for the same office visit. However, the billings demonstrate that massage therapy was billed using not only the 97200 code (which was the same code used for the doctor's treatment of the patient) but also the -24 modifier (i.e., 97200-24), which indicated that someone other than the doctor had conducted that treatment.[21] Additionally, the billings briefly described the treatment. Burke's treatment was indicated as "physical therapy" and the therapist's treatment as "myofascial T.P. massage." Consequently, the information supplied would show no duplication.

Furthermore, Burke's reaction to the letter from Baker, indicating the Singhs had a poor liability claim in the truck collision, was telling. He immediately prepared to stop treating them and apparently only changed his mind once Gill took over their representation and began to pursue their claims. Also, following the intersection collision, Singh was released to return to work by Burke's office on April 25, 1988, the same day Singh filled out the patient questionnaire regarding the April 20, 1988, collision, indicating he had no previous injuries.

Burke argues that, even if some of the diagnostic testing was medically unnecessary, he did not intend to defraud the insurers because the billings merely represented the cost of procedures that were actually performed. This argument fails to withstand even cursory scrutiny. When a caregiver causes an insurance company to part with money on the basis of medical procedures that, though actually conducted, were not necessary, fraud occurs. Burke

---

[21]Burke cites his use of the -24 modifier as evidence of a lack of intent to defraud, because the RVS reimbursement for a 30-minute office visit and an additional 15 minutes with the doctor was $46.22, while the same amount of time with the therapist, when billed using the -24 modifier, resulted in a $45 reimbursement. Therefore, his scrupulous use of the modifier resulted in a $1.22 savings for the insurer. As noted above, postdating the massage therapy created an initial windfall for Burke, modifier or no. (See fn. 10, *ante.*)

also claims that, because use of the RVS codes is required only in cases of workers' compensation claims, he was free to charge whatever he wanted in personal injury cases. Thereafter, the burden would presumably be on the insured or the insurer to contest the cost of procedures. Again, we disagree. Even though Burke was not required to use RVS codes when billing the Singhs' care, his use of a widely used, standardized system could only suggest to insurers that he was using it accurately. The evidence of Burke's intent was substantial.

### D. *Reliance on Fraudulent Misrepresentation*

■ Burke correctly notes that a conviction of theft by false pretenses requires not only a fraudulent misrepresentation by the defendant, with the intent to defraud, but reliance by the victim upon that misrepresentation in parting with property. (*People* v. *Randono* (1973) 32 Cal.App.3d 164, 172 [108 Cal.Rptr. 326].) Such reliance may be inferred from all the circumstances. (*Id.* at p. 174.) Burke then suggests that because Farmers thought the Singhs' claims were questionable, Farmers did not rely upon his billings to pay the claims. This suggestion would be interesting if Farmers had not paid the claims. They did, however, and that payment is overwhelming evidence that Farmers ultimately accepted the billings. In fact, the evidence suggests that Farmers was concerned about the relationship among the Singhs and the frequency of accidents. The billings could only have served to demonstrate to Farmers that the injuries were legitimate, that the care was necessary, and that a settlement was the best avenue to take.

### E. *Joint Trial*

■ Burke alleges the joint trial prejudicially associated him with Singh and caused confusion for the jury. No motion for severance was made in the trial court; yet, Burke claims this error rises to the level of a due process violation that must be reviewed by the court even without an earlier objection. (*People* v. *Chambers* (1964) 231 Cal.App.2d 23, 28 [41 Cal.Rptr. 551].) He further urges, by both appeal and habeas corpus, that his counsel's failure to move for severance amounted to ineffective assistance.

■ The Legislature has stated a preference for joint trials where defendants are jointly charged. (Pen. Code, § 1098.) In fact, a " 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims. [Citation.]" (*People* v. *Keenan* (1988) 46 Cal.3d 478, 499-500 [250 Cal.Rptr. 550, 758 P.2d 1081].) Furthermore, "[s]everance remains largely within the discretion of the trial court. [Citations.]" (*Id.* at p. 500.)

■ Burke contends that because he was not charged with participating in the staging of the accidents and because there was no evidence the Singhs were not injured, he was unduly prejudiced by the evidence that Singh had staged the accidents. He also contends that he was prejudiced by evidence of Singh's preparation of the fraudulent declarations and of Singh's behavior toward Cathy Kimura. The evidence of Singh's various accidents would likely have been admissible against Burke in a separate trial, given its tendency to prove an intent to defraud on Burke's part, even if he was not charged with staging the accidents or conspiring to do so. On balance, the other evidence was not unduly prejudicial.

In *People* v. *Chambers, supra,* 231 Cal.App.2d 23, upon which Burke relies, defendant Spitler, a convalescent home nurse, was charged with four separate assaults on the same resident of the facility. Chambers, the owner of the home, was charged with only one of those assaults, testimony about which occupied only three pages of transcript. (*Id.* at pp. 24-25.) In finding a denial of due process, the *Chambers* court concluded: "The record . . . was inflated by extensive evidence of brutality of Mrs. Spitler, tending to fasten Chambers, as her employer, with moral responsibility for the acts of his employee." (*Id.* at p. 29.) The case before us is not analogous. Of the 15 counts charged here, Burke and Singh were jointly charged in 6. The jury found them both guilty in five counts. In count five, the jury acquitted Burke, while convicting Singh. Burke was charged by himself in more counts (five) than Singh (four). Neither defendant was prejudiced by the enormity of evidence against the other, nor did some of the counts involve greater moral opprobrium than others. Furthermore, we note that the jury acquitted Burke of four of the counts in which he was charged alone. The jury's verdicts demonstrate a careful discrimination among the charges and between defendants.

We are mindful of the facts in *People* v. *Keenan, supra,* 46 Cal.3d 478, in which codefendants Keenan and Kelly were jointly charged with felony murder. Special circumstances were also alleged against Keenan, who was convicted and sentenced to death. At trial, Kelly testified the murder was the result of a drug rip-off and Keenan was the actual shooter. Kelly said he participated in the crime because he was afraid of Keenan, whom he had seen beat and kidnap another drug dealer, Stevenson. Stevenson confirmed at trial that he had been beaten and kidnapped by Keenan. (*Id.* at pp. 493-494.)

Keenan moved for severance on the ground "that Kelly did not simply seek to exculpate himself by laying blame on defendant. Rather, his 'antagonistic defense' of duress or menace allowed him to present prejudicial

evidence and argument of *uncharged conduct by defendant*, which would not have been admissible against defendant in a separate trial." (*People* v. *Keenan, supra*, 46 Cal.3d at p. 500, italics in original.) The Supreme Court found no abuse of discretion in the trial court's denial of severance, even under the "heightened scrutiny for potential prejudice" applicable to capital cases. (*Ibid.*)

In light of *Keenan*, we hold that Burke was not prejudiced by evidence of his codefendant's wrongdoing in derogation of his due process rights. Further, had a severance motion been made, the trial court was not likely to have granted it; thus, Burke has failed to demonstrate prejudice. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839].) We therefore conclude that counsel's failure to move for severance did not constitute ineffective assistance.

### F. *Preparation of Fraudulent Documents*

■ Singh alleges his conviction of count five (Ins. Code, former § 556, subd. (a)(4)) must be reversed because of insufficient evidence that he unlawfully prepared, made, or subscribed the fraudulent declarations upon which the prosecutor relied for proof of this count.[22] The evidence was uncontradicted that Gill prepared the fraudulent declarations, upon which Farmers relied, based upon the information given to him by Singh. The jury was instructed that a conviction in count five required not only an intent to defraud on Singh's part but also a specific intent to use or allow the documents to be used in support of a claim.

In *People* v. *McKissack* (1968) 259 Cal.App.2d 283 [66 Cal.Rptr. 199], the defendant was convicted of forging a check (Pen. Code, § 470), on the theory that he had provided the stolen check to another person, who had actually filled out the check and cashed it. The court upheld that conviction: "It need not be shown that defendant himself executed the false instrument if there is proof that he procured its execution or aided and abetted another in doing so." (*People* v. *McKissack, supra*, at p. 288.) There is substantial evidence in this record that Singh procured the execution of the fraudulent declarations. Singh's reading of the words "makes" and "prepares" is far too narrow. He cannot disclaim liability for preparing or making a fraudulent document, where the jury found he had the requisite fraudulent intent, merely because another person acted as scrivener.

---

[22]The jury was instructed: "Every person who, with the specific intent to defraud, prepares, makes or signs any writing which he specifically intends to present, use, or allow to be presented or used in support of any false or fraudulent claim for the payment of a loss under a contract of insurance, is guilty of a violation of Section 556(a)(4) of the Insurance Code, a crime . . . ."

### G. *Admissibility of Expert Testimony*

 Singh claims the trial court erred when it qualified Officers Mitchell, Del Marmol, and Mathias as experts without proper foundation. We reject this claim as well.

According to Evidence Code section 801, subdivision (a), expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." Further, "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. Whether a person qualifies as an expert in a particular case, however, depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion in [*sic*] shown. [Citations.]" (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].) This court may find error only if the witness "*clearly lacks* qualification as an expert." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 852 [183 Cal.Rptr. 817, 647 P.2d 93], italics in original, disapproved on other grounds in *People* v. *Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].)

 Singh specifically notes that neither Mitchell nor Del Marmol personally investigated the accidents in question. That is, they did not examine the cars involved or the scenes, but instead relied only upon the statements of witnesses and various reports. Such an approach is not uncommon, however, when expert witnesses become involved at trial. Singh also notes that Mathias never considered the legitimacy or scope of the injuries suffered by the Singhs in forming his opinion that the truck collision was staged. However, each of these points was properly made on cross-examination and bears upon the weight the jury could give the opinions, not the admissibility of the opinions themselves.

Singh cites *People* v. *Hogan, supra*, 31 Cal.3d 815, and *People* v. *James* (1989) 208 Cal.App.3d 1155 [256 Cal.Rptr. 661] for the proposition that personal experimentation or analysis by the expert is required before an adequate foundation is laid. *Hogan* and *James* do not so hold.

In *People* v. *Hogan, supra*, the trial court allowed a criminalist to testify about blood spatter patterns when his experience and training in that area were "nonexistent." (31 Cal.3d at p. 852.) *Hogan* stands for the proposition that an expert may only be allowed to give opinions in an area for which he

is actually qualified. It does not hold that an expert must have done personal experimentation as a foundation for otherwise appropriate testimony. Any such conclusion is based upon a gross overextension of the sentence in *Hogan* that reads: "But mere observation of preexisting stains without inquiry, analysis or experiment, does not invest the criminalist with *expertise* . . . ." (*Id.* at p. 853, italics added.) Here, the witnesses were properly found to be experts and gave admissible testimony within their area of expertise.

*People* v. *James, supra,* involved a defense attempt to call a psychotherapist to give a "diagnostic impression" of the defendant. (208 Cal.App.3d at p. 1163.) The witness himself admitted that he would ordinarily spend two hours with a patient in order to make a diagnostic impression but that he had spent less than thirty minutes with the defendant. (*Id.* at p. 1164.) The *James* court held the trial court did not abuse its discretion in finding there was insufficient foundation for the proffered testimony and that the probative value of the testimony was outweighed by its potential for prejudice. (*Id.* at pp. 1163-1164.) Singh's attempt to assert that this case supports his position is inventive, but unpersuasive.

The intricacies of a fraudulent scheme are not matters of common experience, and the substantial experience of these three officers in investigating accidents and fraud could only have been of assistance to the jury. We find no abuse of discretion here.

## H. *"Profile" Evidence*

On both appeal and habeas corpus, Singh argues that the testimony of Officers Mitchell and Del Marmol amounted to inadmissible "profile" evidence. Singh relies principally upon two California cases: *People* v. *Derello* (1989) 211 Cal.App.3d 414 [259 Cal.Rptr. 265] (hereafter *Derello*) and *People* v. *Martinez* (1992) 10 Cal.App.4th 1001 [12 Cal.Rptr.2d 838] (hereafter *Martinez*).

In *Derello*, the defendant was charged with transportation of cocaine, which required proof that the defendant transported cocaine and did so knowingly. (211 Cal.App.3d at pp. 420-421.) The prosecution presented evidence of the various ways in which Derello's behavior matched a list of characteristics common to drug couriers. This evidence was presented for the sole purpose of " 'explaining initial police conduct in this case. It is not in itself indicative of guilt or innocence in any way.' " (*Id.* at p. 421.) The appellate court ruled that evidence of some of the drug courier characteristics was inadmissible because it was irrelevant to the charges and, as such, could be interpreted by the jury as character evidence. (*Id.* at p. 426.) For

instance, the defendant's clothing, the amount of cash he carried, and his rental of an expensive car at the airport in no way shed light on the question of whether he knew he was transporting cocaine. On the other hand, other evidence of drug courier characteristics, such as the defendant's use of an alias and his peculiar manner of walking through the airport, were admissible as indicative of knowledge. (*Ibid.*)

In *Martinez*, the defendant was charged with various offenses arising out of his arrest while driving a stolen vehicle. (10 Cal.App.4th at p. 1002.) The defendant claimed not to know the car was stolen. (*Id.* at p. 1003.) The prosecution presented evidence on the operation of auto theft rings in that area. (*Id.* at pp. 1004-1005.) Several of the indicia of auto theft rings matched the defendant's circumstances at the time of his arrest, such as the type of vehicle he was driving and the particular route he took. (*Id.* at p. 1006.) The appellate court ruled the evidence inadmissible: "While the similarities may be a proper consideration for law enforcement in investigating criminal activity, they are inappropriate for consideration on the issue of guilt or innocence for the very reason given in the drug courier profile cases: the potential of including innocent people as well as the guilty." (*Ibid.*)

To the contrary is *People* v. *Harvey* (1991) 233 Cal.App.3d 1206, 1209-1215 [285 Cal.Rptr. 158] (hereafter *Harvey*), where four defendants were charged with conspiracy to transport cocaine and to possess cocaine for sale (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, §§ 11352, 11351), after several days of surveillance by law enforcement officers and the ultimate recovery of one hundred eighty kilograms of cocaine and over $200,000 from various locations. An expert witness testified that the defendants' activities were consistent with narcotics trafficking and that, in his opinion, each defendant occupied a position in the hierarchy of a Colombian cocaine distribution cell. (*Harvey, supra,* at p. 1226.) The appellate court approved the admission of this type of expert testimony: "Even though facts may be within the knowledge or understanding of the trier of fact, the conclusions to be drawn therefrom may require expert testimony. [Citations.]" (*Id.* at p. 1227.) The court went on to find no abuse of discretion in the trial court's admission of the particular expert testimony. (*Id.* at pp. 1227-1229.)

We harmonize *Derello, Martinez,* and *Harvey* under the common rule of relevance. Evidence of auto theft rings was inadmissible in *Martinez* because the defendant was not charged with participating in an auto theft ring, just as evidence in *Derello* was irrelevant because the defendant was not charged with being a drug courier per se. The only element at issue in *Derello* and *Martinez* was knowledge (of the illegal nature of the substance transported or the stolen status of the car). Such is not the case here. Singh's posture at trial

was that the collisions were not staged. Short of an admission from him or an accomplice, the prosecution was left to circumstantial evidence. The experts testified in order to explain the relationship between the various pieces of evidence, e.g., the extent of damage, type and extent of injuries, number of passengers in the car, use of a common caregiver or attorney, etc. Their opinions, that the collisions were staged, were based upon the integration of these factors. These opinions were relevant because Singh was charged with staging fraudulent collisions, a sophisticated course of conduct like the drug smuggling and distribution in *Harvey*.

## I. *Evidence of Uncharged Collisions*

Singh alleges on appeal and habeas corpus that the admission of evidence involving the three collisions for which he was not charged was prejudicial. While the prosecution alleged the three charged collisions were staged, Singh's position was essentially that they were, in fact, accidents. The trial court found that evidence of the uncharged collisions was admissible as evidence of a common plan or scheme.[23] We need not decide whether the evidence was admissible on the theory of common plan or scheme, because we hold it was certainly admissible as evidence negating accident. Admission of evidence to negate accident is analyzed differently from admission to establish a common plan or to prove identity.

We look to the Supreme Court's recent pronouncement on this subject: "In determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity. [Fn. omitted.] [¶] The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] [T]he recurrence of a similar result . . . tends (increasingly with each instance) *to negative accident or inadvertence* or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . . [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant probably harbor[ed] the same intent in each instance.

---

[23]Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[Citations.] [Citation.]" (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757], italics added, internal quotation marks omitted.)

■ Evidence of uncharged conduct here, while certainly not similar enough to prove identity (an element not at issue), was similar enough to negate a claim of accident and thus prove the element of intent, whether or not the evidence was sufficient to prove a common plan or scheme. ■ " 'A decision right in result will not be reversed even though the reason stated is wrong.' " (*People* v. *Evans* (1967) 249 Cal.App.2d 254, 257 [57 Cal.Rptr. 276]; *People* v. *Armstrong* (1991) 232 Cal.App.3d 228, 241 [283 Cal.Rptr. 429].)

We also determine the record establishes the court below exercised its discretion, under Evidence Code section 352, to admit or deny admission of this evidence. The court need not expressly say it is doing so, as long as the record demonstrates that the court in fact weighed the prejudice against the probative value of the testimony. (*People* v. *Malone* (1988) 47 Cal.3d 1, 21-22 [252 Cal.Rptr. 525, 762 P.2d 1249].) Here, defendants objected to the admission of the testimony under Evidence Code section 352. The court ruled only after hearing argument from both sides, suggesting it did not feel compelled to admit the testimony but was exercising its discretion to do so.

Finally, we reject Singh's argument that there was insufficient proof of the uncharged collisions to warrant their consideration by the jury. Uncharged offenses must be proved by a preponderance of the evidence. (*People* v. *Simon* (1986) 184 Cal.App.3d 125, 132-134 [228 Cal.Rptr. 855].) Here, the uncharged collisions were sufficiently established. Singh never disputed that they occurred. He disputed that the uncharged, as well as the charged, collisions were staged. Even if innocent, although remarkably unlucky given their number, the uncharged collisions could have provided the experience upon which Singh later relied to construct and enact his fraudulent scheme. The series of incidents as a whole negated the notion of accident. The prosecution was required to and did show by a preponderance of the evidence that Singh was involved in the uncharged collisions.

J.-L.*

· · · · · · · · · · · · · · · · · · · · · · · · · ·

*See footnote, *ante*, page 1343.

## DISPOSITION

. . . . . . . . . . . . . . . . . . . . . . . . . . . .*

The judgment is affirmed as modified, and the petitions for writs of habeas corpus are denied.

Merrill, Acting P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied August 21, 1995, and appellants' petition for review by the Supreme Court was denied October 26, 1995.

---

*See footnote, *ante*, page 1343.