Filed 6/18/24  P. v. Dungan CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN RODERICK DUNGAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B323384<br>(Super. Ct. No. 19CR10611)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 30, 2024, be modified as follows:

On page 3, the last two sentences of the third full paragraph are modified to read:

> At the time of the collision the seatbelt was not buckled.  There was evidence he did not take evasive action to avoid the collision.

There is no change in judgment.

Appellant's petition for rehearing is denied.

YEGAN, Acting P. J.  BALTODANO, J.  CODY, J.

Filed 5/30/24  P. v. Dungan CA2/6 (unmodified opinion)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN RODERICK DUNGAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B323384<br>(Super. Ct. No. 19CR10611)<br>(Santa Barbara County) |

John Roderick Dungan drove into oncoming traffic at over a hundred miles per hour, killing the driver of an oncoming car and her two young children.  Dungan appeals from the judgment after the jury acquitted him of first degree murder and convicted him of three counts of second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b)).[1]  The trial court sentenced him to 45 years to life in prison.

Dungan contends there was insufficient evidence of malice to support convictions for murder.  He also contends the trial

---

[1] Undesignated statutory references are to the Penal Code.

court erred when it precluded argument regarding a lesser related offense; limited psychiatric testimony; and admitted opinions of investigating officers, a text message, and photographs of letters. He additionally contends cumulative error mandates reversal. We correct errors in the abstract of judgment. In all other respects, we affirm.

FACTUAL AND PROCEDURAL HISTORY

*Traffic collision*

On October 25, 2019, Dungan drove his Camaro in Santa Barbara toward State Route 154 (SR-154). At 4:31 p.m., Dungan texted a friend, Ricardo F., asking him to send a message to a woman Dungan knew in junior high school. He wanted to express his feelings for her and to say, "I just wanted to let you know that way too late rather than regret never having told you it ever." One minute later, Dungan texted, "Have a nice life Ricardo, thanks for being a good friend."

Dungan entered westbound SR-154, a winding mountain road. At 4:33 p.m., he texted his parents: "Even though you may have disappointed me sometimes, I still love you both."

As SR-154 approached Cold Spring Bridge, it narrowed to one lane in each direction divided by a double yellow line. The posted speed limit was 55 miles per hour (mph). Signs advised to not pass, and that a narrow bridge was ahead. The bridge has one lane in each direction, with no shoulder.

Carrie Purcell was driving westbound on SR-154 at about 60 or 65 mph. There were no cars in front of her in her lane. She saw Dungan pass her on the left in the oncoming traffic lane going 90 mph or more. All the Camaro's tires were in the eastbound lane. She could see Dungan was heading toward oncoming cars and there would be a collision. She stopped right

2

before the bridge to avoid being involved in the collision.

Nicholas Goddard was driving an SUV eastbound on SR-154 near the bridge directly behind a Chevrolet Volt. He saw the Camaro fully in the lane on the wrong side of the road driving in a straight line into the path of the Volt.

At 4:45 p.m., Dungan hit the Volt head-on.[2] The driver was Vanessa Bley. Her children, Lucienne, age 2, and Desmond, age 4 months, were in the back seat, strapped into car seats. The Volt burst into flames. All three victims died of blunt force trauma.

Examination of the Camaro and its event data recorder showed Dungan's speed at 111 mph five seconds before impact. He accelerated to 119 mph at the time of impact with full throttle application. He unbuckled his seat belt right before the collision. There was no evidence he took evasive action to avoid the collision.

*Evidence of suicidal intent*

The prosecution presented evidence that Dungan intentionally caused the collision based on his statements suggesting he was suicidal. Eight months before the collision, he sent a text message to friends that stated in part: "I'm too sensitive for this reality with a cursed blessing/blessed curse that makes life in this body on this planet not worth living. Enough is enough. If noone [*sic*] can/will help me solve this problem or kill me, then I will try as hard as I can to solve it myself and either succeed or die. . . . If I don't make it, I apologize to everyone I did not get to say goodbye to." Based on this text, Dungan was

---

[2] Dungan presented evidence that the collision was "offset" in that the center to center-left of each vehicle took the brunt of the collision.

3

placed on a mental health welfare hold.

On unknown dates, Dungan sent texts to Ricardo F. that expressed "suicidal ideation." The day before the collision, Dungan asked his mother to tell the cat he loved him. On the morning of the collision, Dungan texted his parents, "I hope one day after I'm gone you realize what you did wrong and understand that I loved you." That afternoon, Dungan's mother found a note on the dashboard of her vehicle that expressed his innocence in a criminal case pending against him. It continued, "I am too sensitive for this reality and I am done [a]llowing an unjust justice system to push me around and bully me. [¶] I love you all, [¶] Goodbye [¶] – John Dungan."

Dungan's mother texted a photograph of the note to the mental health facility where he was residing. When a mandated reporter at the facility received the text, she called 911 due to a "potential risk" of suicide.

After the collision, police searched Dungan's journals. The final entry, dated the day of the collision, said, "I did alright." It ended with the word "Goodbye." None of his other journal entries said "goodbye."

Three days after the collision, photographs of several letters purportedly authored by Dungan were anonymously dropped off at the California Highway Patrol (CHP) office. Some of the letters thanked individuals for being Dungan's friend or for being "part of my life." Several of the letters asked the recipients to "accept this gold" as a symbol of Dungan's gratitude, or had Post-it notes stating "Put 1 oz gold in here."

## DISCUSSION

### *Evidence of malice*

Dungan contends the evidence did not establish either

express or implied malice. We disagree.

We " ' "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.) The substantial evidence test also applies to the intent element of the crime. (*Id.* at pp. 945-946.)

Murder requires express or implied malice. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "Implied malice requires that the defendant act with a wanton disregard of the high probability of death," including a subjective awareness of such risk. (*People v. Moore* (2010) 187 Cal.App.4th 937, 941.) The jury may infer malice " 'from the defendant's acts and the circumstances of the crime.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

In our view, Dungan drove with conscious disregard for life. On a windy day at almost 5:00 p.m., he drove on a winding mountain road while texting. He disregarded the "do not pass" sign, crossed over the double yellow lines, drove with his entire

5

vehicle in the opposing traffic lane, and accelerated to 119 mph directly toward the victims' vehicle without taking evasive action. Because it "takes no leap of logic for the jury to conclude" that Dungan "acted with wanton disregard of the near certainty that someone would be killed" (*People v. Moore*, *supra*, 187 Cal.App.4th at pp. 941-942), we conclude substantial evidence supports the murder convictions.

In addition to Dungan's life-threatening driving, there was substantial evidence of implied malice based on the theory that Dungan intended to commit suicide by intentionally causing a collision. Dungan suggests alternative interpretations for some of his statements, e.g., that he intended to see Ricardo F. again and was just being "dramatic." "But it is the jury's province, in a homicide case, to . . . probe defendant's state of mind, and determine whether or not a defendant killed with implied malice." (*In re Ferrell* (2023) 14 Cal.5th 593, 607.) " '[T]he judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Avila*, *supra*, 46 Cal.4th at p. 703.)

*Lesser related offense*

Dungan contends the trial court abused its discretion when it precluded jury argument that he was guilty of only gross vehicular manslaughter. Again, we disagree.

Dungan requested a jury instruction for the uncharged lesser related offense of gross vehicular manslaughter (CALCRIM No. 592). The prosecution objected and the court denied the request. Dungan does not challenge this ruling on appeal.

Neither vehicular manslaughter (§ 192, subd. (c)(2)) nor gross vehicular manslaughter (§ 192, subd. (c)(1)) is a lesser *included* offense of murder because neither the elements of

6

murder nor the accusatory pleading required driving a vehicle. (*People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1057-1059; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 685-686.) Without the consent of the prosecutor, the court had no obligation to instruct on a lesser *related* offense such as gross vehicular manslaughter. (*People v. Birks* (1998) 19 Cal.4th 108, 136.)

Dungan told the court he intended to argue to the jury that "there are other crimes short of murder that . . . may apply . . . that are less than murder but don't require an outright acquittal." The court ruled that Dungan "could not discuss the elements of any type of manslaughter or discuss manslaughter as a charge but that it was permissible to talk about that the prosecution has filed this as a murder or nothing situation and . . . acquittal on murder is not the same in this situation as lack of criminal culpability."

Without mentioning manslaughter, Dungan's counsel argued that the jury was "stuck with" the prosecution's "murder or nothing" charging decision, and that finding Dungan not guilty of murder would not mean it was an accident, or excusable homicide, or that he was innocent, or that "a horrible crime wasn't committed."

The trial court did not abuse its broad discretion to limit the scope of closing arguments. (§ 1044; *People v. Simon* (2016) 1 Cal.5th 98, 147-148.) Because the distinctions between homicide offenses are technical, we disagree with Dungan's contention that he was entitled to argue gross vehicular manslaughter as a "matter[] of common knowledge." (*People v. Farmer* (1989) 47 Cal.3d 888, 922.) It would have confused the jurors' task to argue that Dungan may have committed a specific crime that was neither charged nor defined. Instead, counsel was "allowed to

'make his central point and to argue in general terms' " that Dungan might be guilty of some offense less than murder. (*Simon*, at p. 147.)

The jury was instructed that an unlawful killing, "depending on the circumstances," is "either murder or manslaughter," and the jury must decide "what specific crime was committed." (CALCRIM No. 500 (modified).) But the instructions did not define manslaughter. The prosecution told the trial court that leaving in the reference to manslaughter was "an oversight." In light of this instruction, Dungan contends that allowing him to argue manslaughter would have enlightened rather than confused the jurors. But the trial court did not abuse its discretion in concluding otherwise.

*Psychiatric testimony*

Dungan contends the trial court erred when it precluded psychiatric testimony regarding lack of suicidal ideation at the time of the collision.

After Dungan's arrest, forensic psychologist Trayci Dahl, Ph.D., interviewed Dungan and gave him psychological tests. Dungan sought to call Dr. Dahl to testify he "was not suffering from a clinical diagnosis of clinical depression with suicidal ideation" at the time of the collision. The court ruled that "to testify that Mr. Dungan was not suicidal on the day of the incident or at the moment of the collision is essentially saying that the defendant did not have the intent to kill. . . . Mr. Dungan's intent at the time in question is an issue that must be left in the capable hands of the trier of fact."

The court nonetheless ruled that Dr. Dahl could testify that Dungan "suffers from a mental illness and . . . what symptoms that mental illness manifests." The defense chose not to call Dr.

8

Dahl.  Instead, they called a psychiatrist, Dr. Adham Malaty.  He concluded Dungan was not suicidal when he evaluated him nine days after the collision.  Dr. Malaty was unable to determine if the collision was a suicide attempt.  But because "there were a lot of red flags," Dr. Malaty recommended discharging Dungan "back to jail with suicide precautions."

"Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused *actually formed* a required specific intent, premeditated, deliberated, or harbored malice aforethought."  (§ 28, subd. (a), italics added.)  But "[n]othing in [section 28] shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."  (§ 28, subd. (d); see Evid. Code, § 352.)

Section 29 prohibits expert testimony "about a defendant's mental illness, mental disorder, or mental defect . . . as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."  It "prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime."  (*People v. Ochoa* (1998) 19 Cal.4th 353, 431.)

There is authority that supports the exclusion of evidence here.  In *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364, an expert's "opinion that appellant had fired impulsively was inadmissible since it was a conclusion concerning appellant's intent at the time of the shooting."  (*Id*. at p. 1362.)  The psychologist could testify that Nunn's "condition *could result* in

9

appellant acting impulsively under certain particular circumstances," but not "that appellant *had acted* impulsively, that is, without the intent to kill, that is, without express malice aforethought." (*Id.* at p. 1365, italics added.) And in *People v. Pearson* (2013) 56 Cal.4th 393, the court excluded evidence that before shooting and killing two of his former coworkers, the defendant " 'thought' about committing a '101 California' " (referring to a recent workplace mass murder) because it "essentially asked the expert to provide an opinion about the required mental state (premeditation and deliberation) and thus was improper under section 29." (*Id.* at pp. 442, 444.)

But other authority would allow Dr. Dahl's testimony. In *People v. Cortes* (2011) 192 Cal.App.4th 873, the expert should have been permitted to testify that the defendant " 'entered a dissociative state after he began to stab [the victim],' " from which the jury could *infer* he lacked malice, premeditation, or deliberation. (*Id.* at pp. 909, 912, italics omitted.) And in *People v. Herrera* (2016) 247 Cal.App.4th 467, a divided panel of this division concluded that the trial court improperly excluded expert evidence that the defendant suffered from a peritraumatic dissociative state at the time of the offense, which deprived him of evidence that "he might not have deliberately premeditated the infliction of [21] wounds on the victim." (*Id.* at pp. 475, 478.)

We need not decide if limiting Dr. Dahl's testimony here was error because it was harmless. Regardless of any evidence of suicidal ideation, we conclude that implied malice was established by overwhelming evidence. Dungan drove on the wrong side of a winding narrow mountain road and accelerated to 119 mph directly into the path of an oncoming vehicle evincing "wanton disregard of the near certainty that someone would be

killed." (*People v. Moore, supra*, 187 Cal.App.4th at p. 941.)  It is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  And under *Chapman v. California* (1967) 386 U.S. 18, 24, we conclude the error was harmless beyond a reasonable doubt.  (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 408-409 [§ 29 violation harmless under *Watson* and *Chapman*].)

*Opinion testimony*

Dungan contends the trial court prejudicially abused its discretion when it permitted two law enforcement officers to testify the collision was intentional.  We are not persuaded.

Sheriff's Detective Michael Carlson was assigned to the coroner's bureau for nine years and investigated over a thousand deaths.  Based on his investigation, Carlson testified: "[I]f there would have been no indication of the suspect in this case having suicidal ideation and making the statements that he wanted to collide with someone on 154"[3] then he "would be dealing with an accident.  But in this case it changes the manner of death completely when there's an intentional act that occurs."

CHP Detective Jeffrey Clements testified as the lead investigator.  Based on his investigation and interviews, Clements testified: "The highway patrol defines a traffic collision as an unintended event that causes damage or injury.  So in this case it was my belief that this was intentional."  Clements clarified that he was not giving an opinion of "the state of mind of

---

[3] The court overruled the objection that the testimony was speculation.  Dungan correctly notes that there was no other evidence that Dungan said he wanted to collide with someone on SR-154.

11

the defendant." The trial court overruled objections based on improper opinion testimony and relevancy.

Expert testimony is admissible on a subject "sufficiently beyond common experience" if based on matter "of a type that reasonably may be relied upon by an expert." (Evid. Code, § 801, subds. (a) & (b).) A police officer trained and experienced in traffic accident investigations may testify regarding the cause of an accident. (*People v. Singh* (1995) 37 Cal.App.4th 1343, 1362-1364, 1377-1378 [opinion that accidents were staged]; *Enos v. Montoya* (1958) 158 Cal.App.2d 394, 399 [opinion of what speed reasonable].) An expert may testify to an opinion that "embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805; *People v. Spence* (2012) 212 Cal.App.4th 478, 509.) We review admission of such evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Ca1.4th 690, 717-718.)

We conclude the trial court did not abuse its discretion in admitting these opinions. The detectives' testimony that the collision was intentional was reasonably based upon their review of the facts. Moreover, admission of this testimony was not prejudicial because it is not reasonably probable a result more favorable to Dungan would have been reached in the absence of this evidence. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 395.)

*Text message*

Dungan also contends the trial court abused its discretion when it admitted a text message Dungan sent eight months before the collision stating he was "too sensitive for this reality" and that life was "not worth living."

We conclude there was no abuse of discretion here. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 717.) The text message was relevant to whether Dungan intended suicide at the time of the

12

collision and no more prejudicial than Dungan's other texts and letters. The age of the text message affects its weight, not its admissibility. (*People v. Scott* (2011) 52 Cal.4th 452, 490 [habit of staying out late several months before crime]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1172-1173 [statement of intent three years earlier].)

*Letters*

Dungan contends that photographs of letters, envelopes, and Post-it notes anonymously provided to the CHP four days after the accident were insufficiently authenticated, irrelevant, and unduly prejudicial. We disagree.

The letters were signed "John Dungan" or "John." An investigating officer testified the letters were all on the same type of lined paper, with similar handwriting, and used the same type of pen. The officer properly opined that the letters had the same handwriting as the journal entries he had seen. (Evid. Code, § 1416.) In addition, Dungan's journal entry the day before the collision mentioned wanting to deliver a letter to the addressee of one of the letters. The letter was thus "authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing." (Evid. Code, § 1421.)

We conclude the trial court properly exercised its discretion to determine the preliminary fact of sufficiency of the evidence of authenticity of the writings. (Evid. Code, § 403, subd. (a)(3); *People v. Lucas* (1995) 12 Cal.4th 415, 466.) And the jury determined the authenticity of the letters and was properly instructed to consider Dungan's oral or written statements only if it decided he made them. (CALCRIM No. 358: see Evid. Code,

13

§ 1417.)  " 'The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' "  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.)

Dungan also contends the letters were irrelevant because they did not prove an intent to commit suicide.  We disagree because the jury could reasonably conclude that the letters showed suicidal intent.  They thanked several people, including childhood friends, for their friendship.  One letter said, "I am satisfied with your chapter in my life story."  Another said, "I wish I had been a better person for you in this [life]."  A reasonable inference is that Dungan was saying goodbye to individuals who had been meaningful in his life, and bequeathing them his gold.  "The existence of [a] possible conflicting inference goes to the weight rather than the admissibility of the [evidence], because conflicting inferences are for the jury to resolve."  (*People v. Garcia* (1988) 201 Cal.App.3d 324, 329.)

*Cumulative error*

Dungan contends that cumulative errors constitute prejudicial error.  The claim is rejected because " ' "defendant received due process and a fair trial.' " "  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

*Abstract of judgment*

We agree with the parties that section 1 of the abstract of judgment must be corrected to include the offenses of which Dungan was convicted (counts 1, 2, and 3: Pen. Code, § 187, subd. (a)), the year they were committed (2019), the date of conviction (August 2, 2022), that the convictions were by jury, and the sentences are consecutive; and in section 8 to delete the inapplicable references to sections 667, subdivisions (b)-(i) and 1170.12 (Three Strikes Law).

14

## DISPOSITION

We order the abstract of judgment to be corrected as stated above.  (§ 1260.)  The trial court shall prepare an amended abstract of judgment and send a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:



YEGAN, Acting P. J.



CODY, J.

15

Thomas R. Adams, Judge

Superior Court County of Santa Barbara

_____

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.